**In re PHILIP MORRIS SECURITIES LITIGATION.**

**No. 93 Civ. 2131(RO).**

United States District Court,
S.D. New York.

Jan. 9, 1995.

Melvyn I. Weiss, Sharon Levine Mirsky, Jeffrey S. Abraham, Milberg Weiss Bershad Hynes & Lerach, Arthur N. Abbey, Mark C. Gardy, Abbey & Ellis, New York City, Leonard Barrack, Anthony J. Bolognese, Barrack, Rodos & Bacine, Philadelphia, PA, for plaintiffs.

Herbert M. Wachtell, Paul Vizcarrondo, Jr., Stuart C. Berman, Wachtell, Lipton, Rosen & Katz, New York City, for defendant.

## OPINION AND ORDER

OWEN, District Judge.

This class action had its genesis on Friday, April 2, 1993. That morning Philip Morris announced that it would reduce the average price on its flagship Marlboro cigarette brand by forty cents per pack. Philip Morris expected that, as a result of this, operating earnings for 1993 from its United States tobacco business would be down as much as forty percent.

Less than five hours later, at 1:25 p.m., the first of these class action lawsuits was filed on behalf of a plaintiff that had bought 60 shares during the alleged class period. Four more lawsuits were filed that same day, and on the very next business day—Monday, April 5—five additional lawsuits were commenced. In each of these complaints, pleaded almost entirely on information and belief, plaintiffs accused defendants of having made fraudulent statements so as to artificially raise the price of Philip Morris' common stock. Supporting plaintiffs' conclusory allegations were a few public statements made earlier in the year with a comparison to the April 2 announcement, and the allegation that because of differences in the announcements the defendants must have committed fraud. I note that in the few hours counsel devoted to getting the initial complaints to the courthouse, overlooked was the fact that *two* of them contained identical allegations, apparently lodged in counsel's computer memory of "fraud" form complaints, that the defendants here engaged in conduct "to create and prolong the illusion of [Philip Morris'] success in the *toy industry.*" (Emphasis supplied).

Under the circumstances, an observation by the court in *Ferber v. Travelers Corp.,* 785 F.Supp. 1101 (D.Conn.1991) at 1106, n. 8 seems remarkably apt:

> ... [T]he court finds it peculiar that four of the lawsuits consolidated in this action were filed around 10:00 a.m. on the first business day following Travelers' announcement of the loss reserve increase. Most of the complaints are virtually identical (including typographical errors). At the hearing the court inquired about the swiftness of the plaintiffs' response to the announcement by Travelers. Counsel for the plaintiffs represented that "people in [his] firm worked throughout th[e] weekend" to obtain the documentation necessary to file the complaints.... The court also asked:
>
>> [H]ow did you get to be so smart and to acquire all this knowledge about fraud from Friday to Tuesday? ... [O]n Friday afternoon did your client suddenly appear at your doorstep and say "My God, I just read in the Wall Street Journal about Travelers. They defrauded me," and you agreed with them and you interviewed them and you determined that there was fraud and therefore you had a good lawsuit, so you filed it Tuesday morning, is that what happened?

*Id.* Counsel for the plaintiffs was not responsive to this line of inquiry.

Now before me is a motion to dismiss the "Consolidated Amended Class Action Complaint" of plaintiffs and thirty-four law firms. The action, basically pleaded on information and belief[1], alleges violations of § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), claiming misstatements and omissions relating to defendant Philip Morris' domestic tobacco operations and, specifically, their flagship Marlboro cigarette brand. Plaintiffs' class is defined as those who invested in Philip Morris stock between January 7 and April 2, 1993. Defendant Philip Morris is incorporated in Virginia, headquartered in New York, and is well known in the tobacco, food and beer industries. Half of its operating profits are generated from domestic tobacco operations, and full-priced brands such as Marlboro constitute nearly 90% of the profits from tobacco operations. Largely because Marlboro is the most popular cigarette sold in America, Philip Morris has been the domestic tobacco industry leader for the past nine years.

Plaintiff's claim of fraud[2] is predicated on various statements made by Philip Morris officials between January 7 and mid-March 1993 that allegedly inflated the price of Philip Morris stock and induced plaintiffs to purchase shares. On April 2, Philip Morris announced the said new marketing strategy that included a price reduction of $0.40 per pack of Marlboro cigarettes, which, it was estimated, would decrease projected earnings of domestic tobacco products for 1993 by nearly 40% in comparison with the previous year. This announcement caused Philip Morris common stock to lose nearly 25% of its value, falling from $64.125/share at the close of the market on April 1 to $49.375/share by the close of April 2.

Defendants now move to dismiss the consolidated amended complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Such a motion must be denied unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), and in viewing any claim, I must draw all reasonable inferences in favor of the plaintiff. Defendants contend that the complaint neither pleads an actionable claim under § 10(b) or Rule 10b–5 of the Securities Exchange Act nor satisfies Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pleaded with particularity. There must be some allegations of acts or conduct indicating that the Philip Morris declarants knew or should have known the statements to be false at the time they were made. *Schwartz v. Novo Industri, A/S,* 658 F.Supp. 795, 799 (S.D.N.Y.1987). For a § 10(b) and Rule 10b–5 fraud claim, plaintiffs must establish (1) material misstatements or omissions, (2) indicating an intent to deceive or defraud, (3) in connection with the purchase or sale of a security. *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986).

The complaint does set forth arguably optimistic statements as follows:

On January 7, 1993, Philip Morris issued a press release in which Hans G. Storr, Executive Vice President, Chief Financial Officer and a director of the Company, remarked:

> While the environment in 1993 will be as challenging as in 1992, we are budgeting for and expecting a strong year for all of our businesses.

---

1. The amended complaint reads in relevant part:

 All allegations made in this Consolidated Amended Class Action Complaint are based on information and belief, except those allegations which pertain to the named plaintiffs and their counsel, which are based on personal knowledge. Plaintiffs' information and belief is based, *inter alia,* on the investigation made by and through plaintiffs' counsel of publicly available information, including defendants' statements concerning the subject matter of this Complaint, defendants' filings with the Securities and Exchange Commission for the applicable period, relevant journals and analyst reports, and other materials. The remaining facts underlying the Complaint's allegations are exclusively in defendants' control.

2. "Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) (citations omitted).

On January 12, 1993, John Nelson, a senior vice president of Philip Morris, was reported by Reuter's as saying,

> We expect to do better this year than last year. Marlboro is still very strong in the face of very low pricing ... I think we'll be able to cut the decline rate.

The following day *The Wall Street Journal* reported that Philip Morris' central concern in 1993 would be on profits rather than market share. Senior Vice President Lawrence Wexler is quoted as saying that Marlboro "is doing quite well within the competitive environment."

On January 27, Philip Morris released its financial results for the fourth quarter and fiscal year 1992, indicating a 20% growth in earnings. The complaint quotes Chairman of the Board and Chief Executive Officer of Philip Morris Michael A. Miles' statement:

> [B]ased on our growth and productivity initiatives, increasing volume momentum, and narrowing of price gaps in a number of our key categories, we are optimistic about 1993.

The complaint also quotes that a February 19 statement by an unnamed Philip Morris official, "It's part of our strategy to narrow the price gap between branded and private labels, and to add value to premium brands."

On March 11, 1993, Philip Morris issued its 1992 Annual Report, which included a letter to shareholders in which defendants Miles and Murray stated that the tobacco industry had "excellent volume growth and income potential for the future.... We expect 1993 to mark another year of strong growth in earnings per share." The Letter to Shareholders: further stated: "[o]ur 1992 performance demonstrates the underlying strength of our business, as well as our momentum for continued growth." With respect to domestic tobacco operations, the Letter stated that Philip Morris

> continued to compete successfully in both the full-priced and discount segments. In spite of a volume decline, our full priced cigarettes reached a record 49% share of the full priced segment, while our discount brands grew more than 10%. Despite intense price competition, we widened our

position as the profit leader in the U.S. cigarette industry, accounting for more than half the industry's profits, and nearly all its profit growth.

Plaintiffs highlight other statements from the Annual Report, including:

> The growth of the discount segment, particularly deep discount products, hurt the performance of full priced brands—particularly our competitors brands.

> We strive to accomplish our objectives by emphasizing trademark value on all our cigarette brands to maintain our competitive advantage. Our position as the low-cost producer in the U.S. cigarette industry should help us continue to increase our profits from our domestic tobacco business.

> Our major challenge is to maintain this superior performance. We believe that we have the plans, programs and people to achieve this goal.

On April 2 William Campbell, President and Chief Operating Officer of Philip Morris U.S.A., announced the new pricing strategy. Campbell stated, as reported in *The Wall Street Journal*, that "[t]he news had gone from good to bad in a very short time.... This market has moved very quickly. We don't see it today the way we saw it in January."

Plaintiffs, on the basis of the foregoing, assert that the sudden implementation of the new strategy meant that the prior statements were false and misleading. Philip Morris has, however, put before the court, without contradiction as to accuracy, the context and additional parts of plaintiffs' selected quotations, supra, which the court may consider, *see, Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Crystal v. Foy,* 562 F.Supp. 422 (S.D.N.Y.1983) at 427 and particularly n. 20 thereon. The further quotes are as follows (emphasis supplied):

January 13, 1993 (Reuters):

> [T]*he market for discount cigarettes grew seven pct in 1992* from a year ago; ship-

ments of ... *Marlboro declined about 5.6% in 1992* compared with 1991;

January 13, 1993 (*The Wall Street Journal*):

Cheap smokes are inflicting lasting damage on the Marlboro man.

\* \* \* \* \* \*

The resulting impact on Philip Morris profit has alarmed some shareholders....;

January 27, 1993 (Philip Morris press release):

Philip Morris U.S.A.'s cigarette volume based on shipments *declined* 2.9% to 214.3 billion units, due in part to a previously announced inventory adjustment, compared with a domestic industry shipment volume decline of 0.5%. *This reduced Philip Morris U.S.A.'s share of the industry* by 1.1 share points to 42.3%.

Although *Marlboro's shipment volume was down* 5.6% to 124 billion units, due in part to wholesaler inventory adjustments, Marlboro's retail takeaway declined only 2.5;

January 27, 1993 (Reuters):

[I]f the economy improves, the *shift* of consumers away from full-priced cigarettes will *slow*. 'The *trend* will definitely *slow down* with an improving economy'.... 'That has happened before',

'It's *possible* that because of that pricing action, that full-price cigarettes are again going to be more attractive'.... 'Recovery from recession and consumer confidence both influence a smoker's decision as to whether to buy full-priced or discount-priced cigarettes'.... 'The (sales) trends have been favorable *in the last few weeks*';

February 19, 1993, (Dow Jones):

Last month, the company [Philip Morris] *acknowledged the depth of the problem created by consumers' defection to private label,* when it said for the first time that shipments of its Marlboro brand fell 5.6% in 1992, *it's [sic] steepest drop ever;*

March 11, 1993 (Philip Morris Annual Report):

The *Marlboro* family's volume was down 7.3 billion units (5.6%) from 1991, resulting in a 24.4% market share as compared with a 25.8% market share in 1991. The dis-

count segment of the market continued to grow and accounted for 30.2% of the U.S. cigarette industry in 1992, compared with 25% in 1991. In 1992, industry discount shipments increased 20%; shipments of the Company's discount brands increased 10.5% to 41.5 billion units, resulting in a 27.1% share of this segment in 1992, compared with 29.5% in 1991. The deep discount subsegment more than doubled in 1992 to a 14.9% share of the total industry, an increase of 8.4 share points over 1991.

 Taken together, the totality of all these statements reflects neither misleading optimism nor fraud. Rather, they are indicative of a company that is looking at troublesomely mixed results in an increasingly competitive industry. Some of the trends seemed relatively positive at the time—a continuing decrease in the decline rate or market share for Marlboro would stabilize revenues and profits, making 1993 a good year for the company. Other trends, of which the public was told, portended a graver situation. For example, both Philip Morris and outside analysts such as Gary D. Black of Sanford C. Bernstein & Co. noted that Marlboro's market share had declined 5% in 1992—a precipitous drop for any major consumer brand according to *The Wall Street Journal,* on January 13, 1993. Disclosure requirements are not intended to "attribute to investors a child-like simplicity"; investors are presumed to have the ability to be able to digest varying reports and data. *Flamm v. Eberstadt,* 814 F.2d 1169, 1175 (7th Cir.1987), *cert. denied,* 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987). The total mix of information is determinative, and the court must assess, as must investors at the time, *all* of the statements *and* predictions issued by Philip Morris in the context, fluid as it was, in which they were made.

 Further, the bespeaks caution doctrine is applicable here. Thus, where the totality of statements is generally cautious, projections therein which are however qualified by assorted variables outside the control of the speakers, may not be looked to for a cause of action. *See, e.g.; Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 335 (S.D.N.Y.1993); *Hayden v. Feld-*

*man,* 753 F.Supp. 116, 120 (S.D.N.Y.1990). To extract a few of the more upbeat statements from the context in which they were made, and indeed separate them from their other statements which bear on them without specific allegations supporting fraud is to present an inadequate complaint.

In *DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) (citation omitted), the Court, in affirming the dismissal of a complaint alleging that a failed bank had known and failed to disclose the number of uncollectible loans, observed:

> The story of this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud. That ingredient is missing in the [ ] complaint.... Rule 9(b) required the district court to dismiss the complaint, which discloses none of the circumstances that might separate fraud from the benefit of hindsight. There is no "fraud by hindsight", in Judge Friendly's felicitous phrase.

*Id.* at 627–28.

The complaint's high-water mark is the fact of certain test marketing of discounted Marlboro cigarettes in late 1992. Plaintiffs claim that since Philip Morris was selling Marlboros in certain test markets at a reduced price before the class period, it had a duty to disclose this fact and what change in plans such tests might be suggesting—and it was fraud not to. Although courts have held that under certain circumstances a corporation is required to disclose financial

plans, no court has ever required a company to keep the investing market apprised of its marketing plans. *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1491 (D.Del.1984); *Feder v. Macfadden Holdings, Inc.,* 698 F.Supp. 47, 51 (S.D.N.Y.1988). Test marketing in the circumstances recognized to be present here does not a disclosable fact make, even if Philip Morris was "actually" or "seriously" considering action based on the results, as plaintiffs, without further factual support, alternatively plead.[3]

In the final analysis, plaintiffs are essentially contending that the statements they focus on are optimistic and induced them to purchase Philip Morris stock, an argument premised upon the fraud on the market theory.

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such as case is no less significant than in a case of direct reliance on misrepresentations.

*Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir.1986). But fraud can only be perpetrated upon the market if that market does not have material information or has incomplete or inaccurate information. Here, the discussion above indicates that Philip Morris did not disseminate inaccurate information; the totality of the statements and opinions plaintiffs rely on were clearly mixed. Most important, the investing public was well aware of the competitive environment in which the statements were made. Newspaper articles such as the one in *The Wall Street Journal* on January 13, published just a week after the class period commenced, indicated that the market was well acquainted with the

---

3. Indeed, defendant logically observes that no company is required to damage its own interests (and those of its shareholders) by prematurely revealing to its *competitors* sensitive and tentative price strategies.

competitive environment facing the tobacco industry and Marlboro's troubled footing in it. It is headlined, "Marlboro Smokers Defect to Discounters" and begins, "Cheap smokes are inflicting lasting damage on the Marlboro man." On January 5, 1993, a tobacco industry analyst at Sanford C. Bernstein & Co., issued a report stating that Marlboro's volume dropped 9% at supermarkets and some convenience stores in September and October of 1992. This report was reviewed in *The Wall Street Journal* on January 13, 1993. As observed earlier, Philip Morris' Annual Report noted shipment and market share declines of Marlboro cigarettes. Under the efficient market hypothesis the market price of shares traded on a sophisticated market reflects all available information. *Basic Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988). Accordingly, in viewing this complaint, balanced by omitted portions of statements plaintiffs otherwise rely upon, it appears that all material information was available.

Finally, in *Ciresi v. Citicorp*, 782 F.Supp. 819, 822 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992), it was held that a speaker must have "disseminated the forecasts knowing that they were false or that the method of preparation was so egregious as to render their dissemination reckless," (quoting, *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 137 (S.D.N.Y.1989)). Whatever else, there is no showing of this. Further, in the same vein, "[s]tatements about future events

that are plainly expressions of opinion and not guarantees are not actionable under the federal securities laws." *Hershfang v. Citicorp*, 767 F.Supp. 1251, 1256 (S.D.N.Y.1991).[4]

Given all the foregoing, the amended complaint is dismissed.[5] None of the allegedly fraudulent statements are actionable, and no alleged fraud is pleaded with sufficient particularity.[6]

---

4. Another observation in *Hershfang, supra*, appears applicable:

> Plaintiffs have stitched together a patch of work of newspaper clippings and proclaimed the result a tale of securities fraud. But by even the modest standards of Rules 9(b) and 12(b)(6), it isn't. Read as a whole, the complaint creates the strong impression that when Citicorp announced a cut in dividends, plaintiff's counsel simply stepped to the nearest computer console, conducted a global Nexis search, pressed the 'Print' button, and filed the product as their complaint.

> *Id.* at 1259.

5. In view of this disposition, I need not do more than note the dismissal of plaintiffs' aiding and abetting claims mandated by *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, — U.S. —, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

6. While the complaint has already been once amended, plaintiffs' alternatively ask for leave to replead. The request is contained in a footnote at the end of their memorandum of law and states that on such repleading they would

> include allegations concerning events occurring subsequent to the filing of the Complaint which provide further support for plaintiffs' claims including, *inter alia*, that, owing to the price cuts announced on April 2, 1993, Philip Morris just yesterday [October 19, 1993] reported third quarter earnings down 24.8% from the comparable year earlier period.

But none of this would cure the failure to have adequately pleaded fraud by foresight, the conclusion reached on the pages above. The application to replead is denied.