75 F.3d 801
 64 USLW 2473, Fed. Sec. L. Rep. P 99,017,
34 Fed.R.Serv.3d 530
 SAN LEANDRO EMERGENCY MEDICAL GROUP PROFIT SHARING PLAN,
Randy Stark, Daniel D. Kleppner, Stuart Wechsler, Craig
Aronberg, Rubin Kreis, Irma Kreis, Samuel Spear Pension
Plan, Clyde Cutner, The Scotus Fund, Naomi L. Raphael,
Martin Offenberg, Susan Burt Collins, as custodian for
Katherine M. Collins, Victor Rone, Steven J. Weiss, Irvin
Reiss, Alexander Ledonne, Ronald A. Stokley, Trustee F/B/O
Marcella L. Cohen U/A Trust dated 2/5/83 and 12/29/89, M.A.
Silver, D.C. Silver, Trustee, Lisa F. Cannon Irrevocable
Trust dated 12/14/91, F/B/O Lisa F. Cannon, Esther Salsitz
Dezube, Lonnie B. Reiver, Robert Thomas Securities in
Restricted Reserve Account for the Benefit of Greenwood
Financial Services, Inc., John W. Turner, Judith Beldock,
George Weisz, Frank Noble, Jane Hillman, and Caren Groffman,
Plaintiffs-Appellants,
v.
PHILIP MORRIS COMPANIES, INC., Michael A. Miles, William B.
Murray, Hans G. Storr, William I. Campbell and
Hamish Maxwell, Defendants-Appellees.
 No. 97, Docket 95-7156.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 12, 1995.
Decided Jan. 25, 1996.
 
 Nicholas deB. Katzenbach, Princeton, NJ (Arthur N. Abbey, Judith L. Spanier, Abbey & Ellis, New York City; Melvyn I. Weiss, Sharon Levine Mirsky, Jeffrey S. Abraham, Milberg Weiss Bershad Hynes & Lerach, New York City; Leonard Barrack, Gerald J. Rodos, Anthony J. Bolognese, Barrack Rodos & Bacine, Philadelphia, PA, on the brief), for plaintiffs-appellants.
 Herbert M. Wachtell, New York City (George T. Conway III, Stuart C. Berman, Dan Himmelfarb, Wachtell, Lipton, Rosen & Katz, New York City, on the brief), for defendants-appellees.
 Before: NEWMAN, Chief Judge, LUMBARD and VAN GRAAFEILAND, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 This appeal concerns the recurring issue of whether a complaint alleging securities fraud is sufficient to survive a motion to dismiss. More precisely, the issue is whether, under the circumstances of this case, a company has a duty to disclose its consideration of an alternative business plan in order to prevent its prior statements from becoming misleading. The issue arises on an appeal by members of a plaintiff class of shareholders who bought stock in Philip Morris Companies Inc. ("Philip Morris") at an allegedly inflated price during a portion of 1993. They appeal from the January 18, 1995, judgment of the District Court for the Southern District of New York (Richard Owen, Judge) granting the motion of defendants, Philip Morris and five of its senior executive officers,[1] to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. See In re Philip Morris Securities Litigation, 872 F.Supp. 97 (S.D.N.Y.1995). Plaintiffs also appeal from the District Court's denial of their motion for leave to amend the pleadings. For the reasons that follow, we conclude that the claim of issuing misleading statements was properly dismissed, but that an allegation of individual insider trading must be reinstated against one of the defendants. We therefore affirm in part, reverse in part, and remand.
 
 Background
 
 2
 In recent years, cigarette sales have been declining because of health concerns and changing demographics. The entry of discount brands into the marketplace has led to a further decline in sales in premium brands such as Philip Morris' Marlboro line, the most popular and largest selling brand of cigarettes in the United States. Marlboro is sold and manufactured through Philip Morris U.S.A. ("PMUSA").[2] Historically, in order to sustain or increase its profit levels, Philip Morris has responded to decreasing demand for Marlboro by raising Marlboro's price and at the same time narrowing the price gap between its discount and premium brands in order to make the discount brands less attractive. Philip Morris engaged in this strategy through the first quarter of 1993, and implemented price increases on discount cigarettes during the class period. As plaintiffs acknowledge, however, retailers foiled the company's strategy by deciding to absorb the price increases rather than pass them on to consumers, thus maintaining the large retail price gap between discount and premium brand cigarettes.
 
 
 3
 At the end of the first quarter of 1993, in the face of a declining sales volume and decreasing market share for Marlboro, Philip Morris adopted a new marketing strategy. On March 31, 1993, a plan to reduce the price of Marlboro was presented to Philip Morris' Board of Directors, and on April 2, 1993, Philip Morris announced that it would cut the price of Marlboro by $0.40 per pack, a move estimated to reduce its earnings by $2 billion in 1993. Following this announcement, Philip Morris stock dropped almost 25 percent. Within five hours of the announcement, the first of several lawsuits against Philip Morris had been filed.[3]
 
 
 4
 Plaintiffs asserted a claim for relief under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) (1988), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (1995). Plaintiffs alleged that during the class period, which runs from January 7, 1993, to April 1, 1993, Philip Morris misrepresented or failed to disclose to the market that Marlboro sales were declining at such a rate that raising prices would not compensate for the loss of sales, and that the company was actively considering a new and alternative strategy of cutting Marlboro prices in order to increase market share at the expense of short-term profits. Specifically, plaintiffs alleged that numerous statements made by defendants during the class period are actionable because they misrepresented or omitted to state material facts relating to the company's: (1) marketing strategy for Marlboro and discount brands, (2) results of operations, e.g., sales volume of Marlboro, and (3) expected 1993 earnings. We set out below the statements that plaintiffs alleged are materially false or misleading, with clarifications or additional context offered by Philip Morris included in the margin where relevant:
 
 
 5
 1. In a press release responding to an analyst's report, Philip Morris stated:
 
 
 6
 While the environment in 1993 will be as challenging as in 1992, we are budgeting for and expecting a strong year for all of our businesses.
 
 
 7
 We are encouraged by recent retail supermarket share gains[4] for Marlboro as well as the recent narrowing of the price difference between discount and premium brands.
 
 
 8
 We believe the recent weakness in the price of our stock is based on an overreaction to exaggerated and negative media accounts of tobacco industry issues.
 
 
 9
 Philip Morris Press Release, Jan. 7, 1993 (quoting defendant Storr). Compl. p 44.
 
 
 10
 2. Reuters reported that, at an analyst's meeting, Philip Morris representatives stated that the company's domestic tobacco business "should deliver income growth consistent with our historically superior performance." The report also quoted the following:
 
 
 11
 We expect to do better this year than last year. Marlboro is still very strong in the face of very low pricing [of discount cigarettes].... I think we'll be able to cut the decline rate.
 
 
 12
 Reuters, Jan. 13, 1993 (quoting defendant Campbell and PMUSA executive John Nelson). Compl. pp 45-46.[5]
 
 
 13
 3. In an article about Philip Morris and Marlboro, the Wall Street Journal reported that "tobacco executives" had stated that the main focus for 1993 would be on profits and not on market share. Wall Street Journal, Jan. 13, 1993 (unattributed). Compl. p 48.[6]
 
 
 14
 The newspaper also reported that Philip Morris had said that "the tobacco business is strong and growing" and "is doing quite well within the competitive environment." Wall Street Journal, Jan. 13, 1993 (quoting defendant Campbell and Philip Morris executive Lawrence Wexler). Compl. p 48-49.[7]
 
 
 15
 4. Philip Morris issued a press release stating: "[B]ased on our growth and productivity initiatives, increasing volume momentum, and a narrowing of price gaps in a number of our key categories, we are optimistic about 1993." Philip Morris Press Release, Jan. 27, 1993 (quoting defendant Miles). Compl. p 52.[8]
 
 
 16
 5. Philip Morris announced that it had once again raised the prices of its discount cigarettes, and stated: "[I]t's part of our strategy to narrow the price gap between branded and private label, and to add value to premium brands." Dow Jones News Wire, Feb. 19, 1993 (quoting Philip Morris spokesman Nick Rolli). Compl. p 53.[9]
 
 
 17
 6. The company's Annual Report to shareholders stated, "We expect 1993 to mark another year of strong growth in earnings per share," and described the company's tobacco business as "hav[ing] excellent volume growth and income potential for the future." The Report continued:
 
 
 18
 In the U.S. market, we continued to compete successfully in both the full priced and discount segments. In spite of a volume decline, our full priced cigarettes reached a record 49% share of the full priced segment, while our discount brands grew more than 10%. Despite intense price competition, we widened our position as the profit leader in the U.S. cigarette industry, accounting for more than half the industry's profits, and nearly all its profit growth.
 
 
 19
 In a section entitled "Review of the Year" the Report further stated:
 
 
 20
 The growth of the discount segment, particularly deep discount products, hurt the performance of full priced brands--particularly our competitors' brands. Benefiting from decades of experience in overseas markets with multiple price tiers, we expect to maintain a strong competitive position in the discount category, while expanding our leadership in the more profitable full priced segment.
 
 
 21
 We strive to accomplish our objectives by emphasizing trademark value on all our cigarette brands to maintain our competitive advantage. Our position as the low-cost producer in the U.S. cigarette industry should help us continue to increase our profits from our domestic tobacco business.
 
 
 22
 Our major challenge is to maintain this superior performance. We believe that we have the plans, programs and people to achieve this goal.
 
 
 23
 Philip Morris Companies Inc. 1992 Annual Report, Mar. 11, 1993. Compl. p 57.[10]
 
 
 24
 In addition to alleging that these statements are actionable, the Complaint alleges that Philip Morris conducted "extensive" test marketing of Marlboro at drastically reduced prices in December 1992 in Portland, Oregon, but failed to disclose to the public its consideration of the alternative pricing plan. Compl. p 61.
 
 
 25
 As a separate theory of liability, plaintiffs allege that insider trading by Philip Morris and its executives led to a duty either to abstain from trading or to disclose. In support of their insider trading claim, plaintiffs allege that on March 25, 1993, eight days before the April 2 disclosure, defendant Maxwell sold 103,944 shares of Philip Morris common stock for $62.0625 per share for total proceeds of approximately $6.45 million. Using the proceeds from this sale, he then exercised his stock options to purchase 140,000 shares at the option price of $35.42188 per share, for a profit of $2.6 million. In addition, on January 13, 1993, Philip Morris issued $700 million in debt securities on terms that plaintiffs contend were much more favorable than they would have been if Philip Morris had not failed to disclose material information.
 
 
 26
 The District Court dismissed plaintiffs' claims pursuant to Rules 12(b)(6) and Rule 9(b). The Court first determined that the alleged misstatements and omissions were not actionable. It stated that the "arguably optimistic" statements by Philip Morris representatives were not fraudulent because the total mix of information supplied to investors was not misleading, 872 F.Supp. at 101-02, and " '[s]tatements about future events that are plainly expressions of opinion and not guarantees are not actionable....' " Id. at 103 (quoting Hershfang v. Citicorp, 767 F.Supp. 1251, 1256 (S.D.N.Y.1991)). The District Court also stated that no fraud on the market had occurred, because Philip Morris did not disseminate inaccurate information, and because "the investing public was well aware of the competitive environment in which the statements were made." Id. at 102. Applying the "bespeaks caution" doctrine, the Court reasoned that because the totality of the company's statements were generally cautious, "projections therein which are however qualified by assorted variables outside the control of the speakers, may not be looked to for a cause of action." Id. at 101.
 
 
 27
 With respect to the alternative marketing strategy, the District Court ruled that, although under certain circumstances a corporation is required to disclose financial plans, Philip Morris was not required to keep the public--and competitors--apprised of its marketing plans. Id. at 102. The Court also dismissed the Complaint pursuant to Rule 9(b), concluding that "no alleged fraud is pleaded with sufficient particularity." Id. at 103. The Court denied plaintiffs' request to replead because plaintiffs' additional allegations were insufficient to cure the pleading deficiencies. The Court did not discuss the insider trading claim.
 
 Discussion
 
 28
 To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury. See In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 264 (2d Cir.1993) (citing Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir.1985)), cert. denied, --- U.S. ----, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).
 
 
 29
 I. Duty to disclose arising from prior statements or omissions
 
 
 30
 Plaintiffs contend that prior to April 2, 1993, defendants failed to disclose that they were planning a radical change in pricing strategy for Marlboro that would reduce Philip Morris' 1993 profits by $2 billion. They also allege that the company knew that Marlboro sales were deteriorating and that the company's strategy of raising cigarette prices was no longer succeeding. Although plaintiffs have alleged that the facts at issue "are so overwhelmingly material" that they gave rise to an independent duty to disclose, on appeal the plaintiffs urge only that the defendants had made statements that gave rise to a duty to disclose all relevant material facts in order to render the prior statements not misleading. See Brief for Appellants at 21 n. 5.
 
 
 31
 A. Consideration of documents integral to the Complaint
 
 
 32
 Before considering whether plaintiffs have adequately pleaded that certain misstatements or omissions by Philip Morris are actionable under the federal securities laws, we must first decide whether this Court in resolving that issue may consider the full text of documents only partially quoted in the Complaint. The allegedly actionable statements set forth in the Complaint were culled from press releases, wire service reports, newspaper articles, and annual company reports. In dismissing the Complaint the District Court did not limit its consideration to plaintiffs' selected quotations, but also considered the full text of the documents relied on in the Complaint.
 
 
 33
 We acknowledge that our Circuit has pursued a somewhat uneven course in determining the extent to which the full text of documents partially quoted in a complaint may be considered in ruling on a 12(b)(6) motion. Some previous cases have not permitted consideration of the full text of documents quoted only to a limited extent in the complaint. See Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir.1989); Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir.1985). More recently, however, we considered the full contents of a prospectus deemed "integral" to the complaint "despite the fact that the complaint contains only 'limited quotation' from that document." I. Meyer Pincus and Associates v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir.1991); see Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991) (permitting consideration of stock purchase agreement, warrant, and offering memorandum because plaintiffs had "undisputed notice" of their contents and they were "integral" to plaintiffs' claim), cert. denied, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); see also Kramer v. Time Warner Inc., 937 F.2d 767, 773-74 (2d Cir.1991) (permitting consideration of full text of documents filed with Securities and Exchange Commission of which plaintiff had notice); National Association of Pharmaceutical Manufacturers v. Ayers Laboratories, 850 F.2d 904, 910 n. 3 (2d Cir.1988) (permitting consideration of letter fully quoted in plaintiff's memorandum of law).
 
 
 34
 Plaintiffs have not objected to the District Court's consideration of the full text of documents partially quoted in the Complaint. To the contrary, plaintiffs have urged this Court not to read defendants' statements "in narrow isolation both from their general context and the specific reports in which they were made." That approach would be improper, they point out, "since the issue is 'whether defendants' representations, taken together and in context, would ... mislead a reasonable investor....' " Reply Brief for Appellants at 7-8 (quoting McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir.1990), cert. denied, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991) (citations omitted)). In the pending case, the documents partially quoted in the Complaint are as "integral" to the Complaint as was the prospectus in I. Meyer Pincus, and we therefore conclude that the District Court was entitled to consider the full text of those documents in ruling on the motion to dismiss.
 
 
 35
 B. Nondisclosure of alternative marketing plan
 
 
 36
 In Time Warner, we held that "when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." Time Warner, 9 F.3d at 268. Plaintiffs argue that Philip Morris had stated that it would continue its historic strategy of raising the price of Marlboro in order to sustain profits, but had already test marketed Marlboro at reduced prices, and therefore was under an obligation to disclose its consideration of an alternative and opposite strategy that would focus on increasing market share through a price cut. The District Court found that Philip Morris was under no duty to disclose its strategy to reduce price because the plan was merely a contingency, and because tentative marketing plans are not the type of information companies are under a duty to disclose. The District Court implied that such plans, by their very nature, are not material for purposes of securities fraud.
 
 
 37
 While most marketing plans may be immaterial, the marketing plan involved in this case was of a different kind. This marketing plan was important enough that it required board of directors approval. It marked a sharp break from Philip Morris' historic practices. Its implementation could be expected to reduce the company's 1993 profits by $2 billion and to precipitate a significant decline in the price of the company's stock. See United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir.) (stock movement is a factor the jury may consider relevant in determining materiality), cert. denied, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991). The information was such that a reasonable investor probably would want to know about it. See SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir.1968) (in banc) ("[M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).
 
 
 38
 We are concerned, however, as was the District Court, about interpreting the securities laws to force companies to give their competitors advance notice of sensitive pricing information. Similarly, defendants point to the antitrust concerns raised by what could be considered price signaling if companies regularly issued such information. Defendants also attempt to make a distinction between fundamental corporate transactions, like mergers, which might, under some circumstances, constitute material information even while still tentative, and more mundane operational details such as marketing plans, which defendants contend are not material until all but certain.
 
 
 39
 We decline to hold that marketing plans are per se immaterial. Even if we assume in this case that the company's marketing plans constituted material information, the important question to resolve is whether Philip Morris was under a duty to disclose the possibility of the implementation of an alternative pricing strategy. See Basic Inc. v. Levinson, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988); Glazer v. Formica Corp., 964 F.2d 149, 156-57 (2d Cir.1992). As we stated in Time Warner, "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading...." Time Warner, 9 F.3d at 268. Plaintiffs rely heavily on Time Warner and contend that defendants were under a duty to disclose consideration of the alternative marketing plan because Philip Morris had stated that the company was committed to a strategy of increased prices to sustain profits, but nevertheless was actively considering a strategy to sacrifice profits in favor of market share. We believe that Time Warner went nearly to the outer limit of the line that separates disclosable plans from plans that need not be disclosed, and that the allegations of this case are on the safe side of the line.
 
 
 40
 That Philip Morris engaged in test marketing of Marlboro at reduced prices in December 1992 is not significant. Companies conduct many experiments and tests in connection with their products, and to require the public announcement of each one would risk "bury[ing] the shareholders in an avalanche of trivial information." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 448, 96 S.Ct. 2126, 2131, 48 L.Ed.2d 757 (1976). The only statement we deem pertinent to plaintiffs' claim that defendants had committed to increasing the price of Marlboro in order to sustain profits is the assertion contained in the January 13 Wall Street Journal article that "tobacco executives" had stated that the main focus in 1993 would be on profits and not on market share.
 
 
 41
 There is some question regarding whether this statement meets the Rule 9(b) requirement, as interpreted by this Court in Time Warner, that plaintiffs must identify the speaker of allegedly false statements. See Time Warner, 9 F.3d at 265. In this instance, the statement is not attributed to any specific Philip Morris representative--indeed, the article attributes the statement only to "tobacco executives." On the other hand, the statement is found within an article specifically about Philip Morris and its Marlboro line, and contains numerous quotes from named company officials. In such circumstances, it might be reasonable to permit a factfinder to infer that the statement is attributable to the named officials.
 
 
 42
 Even if attributed, however, such a statement cannot enable the Complaint to survive the motion to dismiss. First, the declaration that the company would emphasize profit over market share is qualified by the context of the rest of the paragraph, the first sentence of which states that Philip Morris intends to increase Marlboro's market share. Thus, Philip Morris indicated that market share was an important consideration in its overall business strategy. Second, this sole comment regarding the company's intent to focus on profits does not remotely compare to the situation in Time Warner, in which this Court noted that the company had "hyped" a specific plan, thereby inducing investors to believe that alternatives were excluded. See id. at 268. A single, vague statement such as the one plaintiffs rely on in this case cannot have led any reasonable investor to conclude that Philip Morris had committed itself to a particular marketing strategy and had foreclosed all alternatives.[11]
 
 
 43
 Other statements that plaintiffs contend gave rise to a duty to disclose Philip Morris' marketing plans primarily referred to the company's goal of "narrowing [ ] the price difference between discount and premium brands." Such statements simply reflected company policy at the time;[12] they were not promises to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan. Finally, plaintiffs contend that general announcements by Philip Morris that it was "optimistic" about its earnings and "expected" Marlboro to perform well required Philip Morris to disclose the possibility of adoption of an alternative marketing strategy that would hurt short-term earnings. Such puffery cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable statements under the securities laws. See, e.g., Time Warner, 9 F.3d at 267; Raab v. General Physics Corp., 4 F.3d 286, 289-90 (4th Cir.1993); cf. Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.1994) (statements that are mere puffery not actionable under New York fraudulent misrepresentation law).
 
 
 44
 C. Nondisclosure of adverse sales figures and lack of success of traditional marketing strategy
 
 
 45
 Plaintiffs argue that defendants' statements projecting continued growth and profitability for Philip Morris gave rise to a duty to disclose both adverse sales figures during the first quarter of 1993 and the overall lack of success of the company's historic marketing strategy. The District Court concluded that the statements were not actionable.
 
 
 46
 We agree with the District Court that the forward-looking statements regarding projected 1993 earnings reflect hope, adequately tinged with caution, and that the total mix of information available to the market cannot reasonably be found to be misleading. During the first quarter of 1993, Philip Morris pursued its traditional marketing strategy, and raised the price of Marlboro while attempting to narrow the price gap between premium and discount cigarettes. There is no basis for inferring that the company was unreasonable in believing that its historic marketing strategy had a high likelihood of success. See Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir.1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud...."). In any event, even the most positive statements by Philip Morris representatives at that time consisted of relatively subdued general comments, such as the company "should deliver income growth consistent with its historically superior performance" (emphasis added) and "we are optimistic about 1993." These statements "lack the sort of definite positive projections that might require later correction." Time Warner, 9 F.3d at 267. As noted above, such puffery is not actionable. See, e.g., Time-Warner, 9 F.3d at 267; Raab, 4 F.3d at 289-90. Moreover, these statements were accompanied by information relating to the defection of consumers from Marlboro to discount brands, as well as references to the difficulties of predicting the impact of the discount market. Liability may not be imposed based on statements that, considered in their entirety, clearly "bespeak caution." See Goldman, 754 F.2d at 1068.
 
 
 47
 With respect to the adverse sales figures, plaintiffs contend that defendants' statements that Marlboro sales were strong and that the rate of decline was being contained were misleading because, in April, Philip Morris announced that retail sales had declined by 8.3 percent in the first quarter of 1993, as compared to a 2.5 percent decline in 1992. As defendants point out, however, plaintiffs make a fallacious comparison. The 8.3 percent figure referred to a decline in wholesale shipments, not retail sales. The previously reported decline rate for wholesale shipments was 5.6 percent, not 2.5 percent, and thus the decline rate did not triple, as plaintiffs allege. Moreover, plaintiffs allege no facts supporting their assertion that defendants had knowledge of the 8.3 percent decline before April, and it is not clear that the decline rate even reached a level of 8.3 percent until the month of April. Nor do plaintiffs offer anything but conclusory allegations to support their contention that defendants knew long before the April 2 announcement that Marlboro was in trouble and that a change in strategy would be necessary. We agree with the District Court that none of the defendants' statements was materially misleading or gave rise to a duty to disclose.
 
 II. Fraud
 
 48
 The District Court also granted defendants' motion to dismiss because it determined that "no alleged fraud is pleaded with sufficient particularity." 872 F.Supp. at 103. In order to satisfy the requirements of Rule 9(b), plaintiffs must allege in what respects the statements at issue were false and also allege facts that give rise to a strong inference of fraudulent intent. See Acito, 47 F.3d at 51-52; Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127-28 (2d Cir.1994). Plaintiffs contend that statements by Philip Morris regarding its pursuit of its traditional marketing strategy, results of sales, and expected 1993 earnings were fraudulent. This appears to be a case of plaintiffs alleging "fraud by hindsight." Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978).
 
 A. Failure to plead false statements
 
 49
 The Complaint lacks sufficient allegations demonstrating the falsity of any statements made by Philip Morris during the class period. Plaintiffs argue that the company's statements that its strategy was to narrow the price gap between premium and discount cigarettes were false because the company had already made the decision, or was actively considering adopting a plan, to slash Marlboro prices. While it may be reasonable to infer that Philip Morris began to consider changing its marketing strategy at least a couple of weeks before the plan was presented to the Board of Directors on March 31, 1993, the plaintiffs have not alleged circumstances indicating how such consideration would have rendered any of the company's prior statements false. Plaintiffs allege no facts demonstrating that during the class period Philip Morris was doing anything but pursuing a strategy of narrowing the price gap between discount and premium brands while maintaining high profit margins on Marlboro; the company's statements at the time simply reflected that strategy. Furthermore, there is no allegation that Philip Morris made any statements or predictions foreclosing the possibility of adopting alternative marketing strategies.
 
 
 50
 Plaintiffs allege that, although Philip Morris represented to the market that retail sales were strong, retail sales were declining at a rate of 8.3 percent--significantly higher than the previously announced rate of 2.5 percent. Plaintiffs allege no circumstances to support their allegation that the allegedly false statements, made at least three weeks before the 8.3 percent figure was announced, were false at the time made. Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss. See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 365 (1st Cir.1994) (requiring plaintiffs to "specifically identify the internal reports and the public statements underlying their claims, providing names and dates"); Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir.1993) ("[R]eferences to unreleased or internal information that allegedly contradict[s] [defendants'] public statements" should indicate such matters as "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them."). Moreover, as discussed above, plaintiffs make a false comparison between the figures, because the 8.3 percent decline was a decrease in wholesale shipments, not retail sales, and thus should have been compared to the previously reported 5.6 percent decline in wholesale shipments for 1992, not the 2.5 percent decline in retail sales. Plaintiffs have made no showing that defendants' descriptions of Marlboro's performance were not based on the facts available to the company at the time the statements were made. Finally, with respect to the company's forward-looking statements, plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance.[13] See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 117 (2d Cir.1982) ("[E]conomic prognostication, though faulty, does not, without more, amount to fraud.") (internal quotation omitted).
 
 
 51
 Since plaintiffs have not alleged circumstances indicating that any of the statements identified in the Complaint were false, the plaintiffs have failed to adequately plead fraud. See Acito, 47 F.3d at 53. Nevertheless, we consider the sufficiency of plaintiffs' allegations regarding fraudulent intent.
 
 B. Failure to plead fraudulent intent
 
 52
 In order to establish scienter for the fraud claim, the plaintiffs must either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing a motive for committing fraud and a clear opportunity for doing so. See id.; Shields, 25 F.3d at 1128. Although Rule 9(b) requires that fraud be pled with particularity, plaintiffs need only plead " 'circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter.' " Cohen, 25 F.3d at 1173 (quoting Connecticut National Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir.1987)). Plaintiffs do not, however, enjoy a "license to base claims of fraud on speculation and conclusory allegations." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990). Plaintiffs have not adequately pled scienter under either prong of the test.
 
 
 53
 (i) Conscious behavior. Plaintiffs contend that the Complaint alleges facts reflecting defendants' knowledge or reckless disregard of the falsity of their statements to the investing public. Since we have already determined that the Complaint fails adequately to allege that defendants' statements were false (affirmatively or through omissions), the Complaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the statements.
 
 
 54
 (ii) Motive and opportunity. Plaintiffs also endeavored to plead scienter by alleging facts that they contend demonstrate both motive and opportunity to commit fraud. There is no doubt that defendants as a group had the opportunity to manipulate the price of Philip Morris stock. See Time Warner, 9 F.3d at 269. The individual defendants held the highest positions of power and authority within the company. The close question is whether the Complaint adequately alleges that defendants had a motive to benefit from nondisclosure of the difficulties faced by Marlboro and the consideration of an alternative marketing plan. See id.
 
 
 55
 On appeal, plaintiffs attempt to assert motive by alleging that an inflated stock price and an illusion of continued profitability (1) maintained the company's bond or credit ratings at the highest possible level, so as to maximize the marketability of the $700 million of debt securities issued in January and minimize the interest rate on those securities, and (2) allowed defendant Maxwell to sell substantial amounts of his stock at the pre-disclosure higher price just days before the April 2 announcement, thereby netting him over $2 million profit.
 
 
 56
 We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Acito, 47 F.3d at 54. While it is true that Maxwell realized a large profit on his stock sales, defendants argue that the fact that Maxwell retained a large holding in the company, and actually acquired more shares by the conclusion of the transactions than he had sold, makes clear that the trading was not "unusual," id., and thus does not permit an inference of scienter under Rule 9(b).
 
 
 57
 In the context of this case, we conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive. See id.[14] For the first time on appeal, plaintiffs allege the additional motive that defendants wished to conceal their marketing plan from competitors in order to gain a competitive advantage from surprise. Because plaintiffs allege no facts in support of this claim, we are satisfied that the facts alleged in the Complaint do not give rise to a strong inference of fraudulent intent, and therefore conclude that the Complaint is insufficient to survive a Rule 9(b) challenge on this basis as well.
 
 
 58
 III. Duty to disclose arising from insider trading
 
 
 59
 A duty to disclose arises when a corporate insider trades on confidential information. See Glazer, 964 F.2d at 157; United States v. Chestman, 947 F.2d 551, 565 (2d Cir.1991) (in banc), cert. denied, 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992). Plaintiffs claim that Philip Morris issued $700 million of debt securities and defendant Maxwell sold substantial amounts of his stock during the class period on terms far more favorable than would have been available had defendants made full disclosure. Plaintiffs contend that these transactions triggered a duty to disclose the company's consideration of an alternative marketing strategy and the likelihood that, in light of adverse sales figures, the company's optimistic earnings projections for 1993 would not materialize.
 
 
 60
 For the same reasons that we did not agree that, in the circumstances of this case, a company's desire to maintain a high bond or credit rating may qualify as a sufficient motive for fraud, we do not agree that the Complaint adequately alleges insider trading by Philip Morris based on the company's sale of $700 million in debt securities. We therefore agree with the District Court that the Complaint does not adequately allege a claim against Philip Morris or individual defendants Miles, Murray, Storr, or Campbell, and we affirm the dismissal of those parties from the suit.
 
 
 61
 On the other hand, defendant Maxwell's sale of stock at a substantial profit just before the April 2 announcement creates cause for concern, at least at the pleading stage. See Kronfeld, 832 F.2d at 732 ("An insider may be liable for trading on the basis of ... information at a time when the corporation to which the information pertains is not yet under any duty to disclose it."); SEC v. Geon Industries, Inc., 531 F.2d 39, 48 (2d Cir.1976) ("[W]hile there 'may be good reasons [for a company] to delay disclosure, they do not justify insider trading' ... 'during the waiting period.' ") (quoting 2 Securities Law: Fraud, § 7.4(4)(b) at 174 (1975)). Defendants argue that Maxwell's retention of a large position in Philip Morris and his pre-announcement purchases vitiate any insider trading liability. While development of all the circumstances might ultimately defeat the claim of individual insider trading, the allegation that Maxwell realized a profit of over $2 million from his pre-announcement transaction gives rise to an inference that he engaged in insider trading, which, if successful, would trigger a duty to disgorge profits.
 
 
 62
 Although alleged in the Complaint, the issue of whether Philip Morris or the individual defendants engaged in insider trading leading to a duty to disclose does not appear to have been fully argued to the District Court. In fact, defendants contend that plaintiffs did not raise this theory of liability before the District Court at all. However, the transcript of proceedings on the motion to dismiss indicates that the issue was at least briefly touched on during oral argument before the District Court. Moreover, we are satisfied that the Complaint includes sufficient allegations of at least individual insider trading. See Compl. pp 59, 73, 74. We remand the individual insider trading claim against Maxwell to the District Court for further proceedings.
 
 IV. Leave to replead
 
 63
 The District Court denied plaintiffs' request to replead. We review for abuse of discretion. See Acito, 47 F.3d at 55. Though leave to file an amended complaint is generously granted, see, e.g., Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir.1986), the District Court had already granted plaintiffs the right to amend their complaint once. The question before us is whether the District Court abused its discretion in denying plaintiffs' request to amend their complaint a second time.
 
 
 64
 Plaintiffs argue that they "were prepared to provide further information concerning, inter alia, the magnitude of the decision to cut Marlboro prices, the prior deliberation at Philip Morris concerning the plan, the roles of defendants in the activities alleged, and how stock market professionals were completely stunned by the April 2, 1993 announcement." Brief for Appellants at 47-48. The District Court found as a matter of law that "none of this would cure the failure to have adequately pleaded fraud by foresight." 872 F.Supp. at 103 n. 6. We agree with the District Court's analysis, see, e.g., Acito, 47 F.3d at 55 (denying leave to replead because the additional information offered would not cure the deficiencies already noted by the court), with one exception. We would consider information relating to the company's deliberations about the marketing plan material, as it could contradict defendants' averments that the plan was not under serious consideration until shortly before it was announced. However, plaintiffs' assertion that they have evidence of such deliberation, is not enough to overturn the District Court's discretionary decision on amendment, at least with respect to a second amendment. We uphold the District Court's decision denying leave to replead.
 
 Conclusion
 
 65
 We affirm that portion of the District Court's opinion ruling that plaintiffs have failed adequately to allege that defendants' non-disclosure of the company's consideration of the new plan to cut prices rendered its prior statements regarding marketing plans, results of operations, and earnings projections misleading. We also affirm the District Court's ruling that the plaintiffs have not alleged fraud with sufficient particularity. We reverse the dismissal of the claim that defendant Maxwell engaged in insider trading and remand for further proceedings in light of this opinion.
 
 
 
 [1]
 The individual defendants are (1) Michael A. Miles, Chairman of the Board and Chief Executive Officer; (2) William B. Murray, President, Chief Operating Officer, and Vice Chairman of the Board of Directors; (3) Hans G. Storr, Executive Vice President, Chief Financial Officer, and a director; (4) William I. Campbell, President and Chief Executive Officer of Philip Morris, U.S.A., the corporate entity through which Philip Morris operates its domestic tobacco business; and (5) Hamish Maxwell, Chairman of the Executive Committee and a director
 
 
 [2]
 In 1992 about half of Philip Morris' operating income came from its domestic tobacco operations. Compl. p 28. Marlboro and Philip Morris' other premium brand cigarettes in turn accounted for more than 90% of PMUSA's profits. Compl. p 58(a). The company generates a profit of approximately $0.55 on every pack of Marlboro it sells, while discount cigarettes generate profits of only $0.05 per pack. Compl. p 33
 
 
 [3]
 The District Court noted that the initial complaints were so hurriedly prepared that:
 two of them contained identical allegations, apparently lodged in counsel's computer memory of "fraud" form complaints, that the defendants here engaged in conduct "to create and prolong the illusion of [Philip Morris'] success in the toy industry." (Emphasis supplied).
 
 
 [872]
 F.Supp. at 98
 
 
 [4]
 As plaintiffs acknowledge, the Complaint misquoted the press release by substituting "recent retail sales trends" for "recent retail supermarket share gains." Compare Compl. p 44 with Philip Morris Press Release, Jan. 7, 1993
 
 
 [5]
 Philip Morris counters that Reuters also reported that a PMUSA executive "estimated that the market for discount cigarettes grew seven pct in 1992 from a year ago"; "[announced that] shipments of ... Marlboro declined about 5.6 pct in 1992 compared with 1991"; and "declined to estimate the company's 1993 share for the entire market in the United States, saying the performance of discount brands would be difficult to predict." Reuters, Jan. 13, 1993 (quoting Nelson)
 
 
 [6]
 The entire paragraph read:
 Marlboro executives say their main focus will be on its full-price business and that it planned to increase its share of the premium market. The company says it plans to maintain its share of the discount market. Tobacco executives said the main focus this year, would be on profits, not market share.
 Wall Street Journal, Jan. 13, 1993.
 Although the first sentence is specific to Philip Morris and states that the company is concerned about increasing its market share, the last sentence is somewhat contradictory, in that the "tobacco executives"--presumably Philip Morris executives--are apparently indicating that market share is not a priority.
 
 
 [7]
 Philip Morris contends that the Journal article was a generally pessimistic account of the company's business. The article was headlined "Marlboro Smokers Defect to Discounters" and reported that company executives admittedly "underestimated the widespread willingness of smokers to switch to bargain-basement cigarettes"; that Marlboro's 5.6% decline in shipments in 1992 "was the steepest drop in the brand's history and sharper than the industry's 0.4% drop overall"; and that the recent success of discount brands had "alarmed some shareholders." The article also referred to "mounting concern" that Philip Morris would not be able to "sustain the annual 20% growth in earnings that it customarily achieves." Wall Street Journal, Jan. 13, 1993
 
 
 [8]
 Philip Morris points out that the following was also contained in the press release:
 Philip Morris U.S.A.'s cigarette volume based on shipments declined 2.9% to 214.3 billion units, due in part to a previously announced inventory adjustment, compared with a domestic industry shipment volume decline of 0.5%. This reduced Philip Morris U.S.A.'s share of the industry by 1.1 share points to 42.3%....
 ... Although Marlboro's shipment volume was down 5.6% to 124 billion units, due in part to wholesaler inventory adjustments, Marlboro's retail takeaway declined only 2.5%.
 Philip Morris Press Release, Jan. 27, 1993.
 
 
 [9]
 Philip Morris points out that the same report stated:
 Last month, [Philip Morris] acknowledged the depth of the problem created by consumers' defection to private label, when it said for the first time that shipments of its Marlboro brand fell 5.6% in 1992, it's [sic] steepest drop ever.
 Dow Jones News Wire, Feb. 19, 1993.
 
 
 [10]
 Philip Morris counters that the Annual Report also included a number of figures showing that the market share and shipment volumes of their premium brands had decreased and that the "growth of the discount segment" had "hurt the performance of full priced brands." Philip Morris Companies Inc. 1992 Annual Report, Mar. 11, 1993
 
 
 [11]
 Neither is Philip Morris in the position of the defendant in Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726 (2d Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988). In Kronfeld, TWA's parent corporation, TWC, failed to disclose in the prospectus for a new issue of TWA stock that one of several reorganizations it was contemplating consisted of terminating its relationship with TWA. In determining that disclosure may have been required, we emphasized that the statute requiring a prospectus " 'was designed to assure compliance with the disclosure provisions of the [Securities] Act [of 1993] by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.' " Id. at 734-35 (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 103 S.Ct. 683, 686-87, 74 L.Ed.2d 548 (1983) (footnotes omitted)). We then held that, because the prospectus discussed the ongoing relationship between TWA and TWC, "and was obviously required to address that relationship," id. at 732 (emphasis added), a question of fact was presented as to whether it was materially misleading, within that discussion, not to disclose the termination option. Id. at 735
 The nature of a prospectus and the rules and regulations surrounding its preparation and dissemination gave rise to the question of fact in Kronfeld as to whether there was a duty to disclose the termination option. A similar question is not raised by the single, general statement recorded in a newspaper article in the instant case.
 
 
 [12]
 Plaintiffs acknowledge that Philip Morris initiated several price increases in pursuit of this strategy during the class period. Compl. p 57(d)(ii)
 
 
 [13]
 Plaintiffs' argument that the optimistic projections by Philip Morris were false relies on their claim that at the time the projections were made (1) Philip Morris was actively considering a marketing plan, consisting of cutting prices, that would render the optimistic projections unattainable, and (2) the company was aware through internal sales reports that Marlboro sales were continuing a steeper decline than the market was being led to believe. As discussed above, the Complaint does not plead facts adequately supporting either of these two allegations
 
 
 [14]
 Additionally, plaintiffs have alleged no facts suggesting that Maxwell acting alone had the opportunity to manipulate Philip Morris' plans for his own advantage