Emerich RESSLER, Carolyn Z. Peoples, Craig L. Johnson, Patti L. Houser Johnson, Gene Blessing, Alex Engel as Trustee for Silver Trust, and Jack Fishbaum on behalf of themselves and all others similarly situated, Plaintiffs,

v.

LIZ CLAIBORNE, INC., Jerome A. Chazen, Harvey L. Falk, Jay Margolis, Allen McNeary, Samuel M. Miller, Jack Listanowsky, Nina E. McLemore, and Leonard Boxer, Defendants.

No. 94–CV–1118 CBA.

United States District Court, E.D. New York.

Aug. 14, 1999.

Sanford P. Dumain (argued), Milberg Weiss Bershad Hynes & Lerach, New York City, Edwin J. Mills, Stull, Stull & Brody, New York City, Kirk E. Chapman, Milberg Weiss Bershad Hynes & Lerach, New York City, for plaintiffs.

Alan R. Friedman (argued), Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, Marvin E. Frankel, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, Gregory A. Horowitz, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for defendants.

## MEMORANDUM & ORDER

AMON, District Judge.

### Introduction

Defendants have moved to dismiss the second amended complaint in the above-captioned securities fraud action pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court grants defendants' motion and dismisses the second amended complaint.

### Background

The second amended complaint is related to a previous complaint filed by plaintiff Jack Fishbaum on July 30, 1993 on behalf of all persons who purchased common stock of Liz Claiborne, Inc. from March 30, 1993 through July 16, 1993, inclusive. *See Fishbaum v. Chazen,* 93–CV–3430 (CBA). On June 30, 1994, this Court dismissed the *Fishbaum* complaint for failure to adequately plead the element of scienter.

The first complaint in the present action, *Ressler v. Liz Claiborne,* was filed on March 11, 1994. Plaintiffs amended the original complaint on May 4, 1994, adding Jack Fishbaum as a representative of the class. *Ressler* is based upon essentially the same facts as were the subject of the *Fishbaum* complaint. Defendants subsequently moved to dismiss the *Ressler* complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. On August 25, 1995, the Court dismissed the complaint for failure to comply with the pleading requirements in Rules 8 and 9(b) but granted plaintiffs leave to amend. Plaintiffs filed the second amended complaint (the "SAC") on October 30, 1995. Defendants filed the instant motion in response.

The SAC alleges that defendant Liz Claiborne, Inc. ("Claiborne") and the individually named defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 promulgated thereunder. The individual defendants were top managers of the Company during the pertinent period and are allegedly "controlling persons" within the meaning of § 20(a) of the 1934 Act.[1]

---

1. At all relevant times, the individual defendants held the following positions: defendant Jerome A. Chazen ("Chazen"), Chairman of the Board of Directors of Claiborne; defendant Harvey L. Falk ("Falk"), Vice Chairman of the Board and President of the Company; defendant Jay Margolis ("Margolis"), Vice Chairman of the Board; defendant Allen McNeary ("McNeary"), Senior Vice President of Claiborne; defendant Samuel Miller ("Miller"), Senior Vice President and Chief Finan-

Plaintiffs allege that during the class period, September 21, 1992 through July 16, 1993, the defendants made a series of false and misleading statements regarding the company's performance, inventory levels, and expected earnings. Plaintiffs assert that defendants made these alleged false and misleading statements in order to artificially inflate the price of Claiborne stock and to maximize their personal profit from the sale of 352,200 shares during the class period.

This purported scheme allegedly unraveled in mid-July 1993. On July 15, 1993, defendant Margolis suddenly announced his resignation as a Vice Chairman and Director of Liz Claiborne. On the following day, and the final day of the class period, Claiborne announced that projected earnings per share for 1993 would be approximately 30% lower than in the prior year. Following this announcement, Claiborne stock prices fell dramatically and newspapers began speculating about the decline in the company's fortunes.

*Discussion*

Defendants move to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) and for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b). In deciding a Rule 12(b)(6) motion, the Court's function is to determine whether the complaint is legally sufficient. *See Festa v. Local 3 Int'l Bhd. Of Elec. Workers*, 905 F.2d 35, 37 (2d Cir.1990). A motion to dismiss must be denied "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing plaintiffs' complaint, the Court must accept as true the plaintiffs' factual allegations, drawing all reasonable inferences in their favor. *See Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995).

■ Ordinarily, a court contemplating a 12(b)(6) motion is limited to the face of the complaint and any documents appended thereto or incorporated by reference. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989). Where a cause of action is based on fraud, however, the Court also may consider documents which form the basis of plaintiffs' allegations if the documents are "integral to the complaint," even if the documents have not been appended by the plaintiff. *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991). Moreover, the Court may consider public disclosure documents actually filed with the SEC and any documents that plaintiff "had either in its possession or had knowledge of and upon which they relied in bringing suit." *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991). The Court may also consider press releases and press reports detailing comments attributable to the defendants. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir.1996).

■ "To state a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Id.* at 808; *see also In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 264 (2d Cir.1993). Defendants argue that the complaint fails to state a claim upon which relief can be granted because (1) plaintiffs have not alleged actionable false or misleading statements and (2) plaintiffs have failed to sufficiently allege the element of scienter.

cial Officer; defendant Jack Listanowsky ("Listanowsky"), Executive Vice President–Manufacturing and Operations; defendant Leonard Boxer ("Boxer"), Director; and defendant Nina E. McLemore ("McLemore"), Senior Vice President–Corporate Development.

### (1) *False or Misleading Statements*

Defendants argument that the SAC fails to identify an actionable false or misleading statement has two primary components. Defendants first contend that the statements set forth in the SAC either constitute non-actionable "puffing" or are too broad and vague to satisfy the materiality element of a securities fraud claim. Second, in a position presented most clearly at oral argument, defendants submit that even if any of the alleged false or misleading statements are sufficiently definite to be actionable, plaintiffs nonetheless have not pleaded facts with particularity demonstrating that those statements were false at the time they were made.

The alleged false or misleading statements can be viewed as falling into two categories: statements concerning present facts and comments on future performance.[2] The following two charts list the statements in each category. To correct certain arguable mischaracterizations of the relevant statements in the SAC, the Court provides the context of the announcement in question.[3] The specific statements alleged by plaintiffs to be actionable appear in italics.

### Statements of Present Fact

| | Date | Source | Alleged Misrepresentations | SAC ¶ | Ex. to Frankel Aff. |
|---|---|---|---|---|---|
| 1 | 9/21/92 | Women's Wear Daily | Speaking at an apparel conference ... Chazen did not provide any specific figures, and the company has repeatedly stated that its plans were conservative based on expectations of low growth in the near term.... Chazen noted *Claiborne's apparel business is on plan or better.* He said that despite the price-cutting in jeans by The Gap, *Liz Claiborne* basic five-pocket jeans selling at $48 and its *fashion jeans at $60 are selling above plan.* .... *Claiborne's sportswear lines are on plan* but career ware is something of a struggle, [Chazen] said.... | 28 | 6 |
| | 11/9/92 | Form 10-Q for period ending September 26, 1992 | The retail environment continues to be adversely affected by a slowdown in consumer spending and *the Company continues to plan its inventory commitments on a conservative basis.* .... Inventories at September 26, 1992 were $299.4 million compared to $322.0 million at year end 1991, and 16.6% higher than the $256.8 million at September 28, 1991. *The increase in inventory levels primarily reflect the expansion of the Company's outlet store operations, and, to a lesser extent, the incremental inventories of the Shoe Division as well as the addition of the Russ Togs Divisions. Management believes that present inventory levels are appropriate to support the currently anticipated sales levels.* | 32 | 8 |

2. The Court recognizes that defendants may take issue with the characterization of certain comments as statements of present fact. The ultimate determination with regard to the actionability of these statements, as discussed below, negates any need to explore this issue.

3. Defendants have provided the source materials for the relevant statements.

| | Date | Source | Alleged Misrepresentations | SAC ¶ | Ex. to Frankel Aff. |
|---|---|---|---|---|---|
| 3 | 11/11/92 | Women's Wear Daily | As Liz Claiborne sets about getting the Russ Togs labels going, *Chazen said he is encouraged by the trend in business over the past two months.* "If it continues, we'll have a good fourth quarter at retai l. But the first quarter of 1993 is a question mark. *"We see a bottoming-out process and improvement taking place,"* he continued, "except in Southern California, where business remains difficult. No one sees the bottom there yet." | 34 | 42 |
| | 12/2/92 | Mabon Securities Conference/Analyst Report | The company's Chairman, Jerome Chazen, discussed current business trends. *Retail sell-through in the fourth quarter 1992 of Liz products is very good.* | 35 | 30 |
| 5 | 3/93 | 1992 Annual Report · | The increase in 1992 year-end inventory levels over the prior year end reflect the expansion of the Company's outlet store operations as well as the incremental inventories of the Shoe Division and the addition of the Russ Divisions. . *Management believes that present inventory levels are appropriate to support the currently anticipated sales level.* | 42 | 13 |
| | 5/13/93 | Form 10–Q for period ending March 29, 1993 | *The* quarter to quarter *decrease in net sales* of 4.6% was due primarily to lower unit volume within certain wholesale apparel divisions, and to slightly lower average unit selling prices within the Company's wholesale apparel operations which were decreased in·order to maintain consumer value and market share. . . . The lower unit volume *reflects* in part the timing of certain shipments as well as *the Company's conservative inventory planning* and continued conservative buying by its retail customers. . . . . *The increase in inventory levels on a period-to-period basis reflects the expansion of the Company's outlet and retail store operations as well as incremental inventories relating. to an in-stock program in several divisions and the addition of inventories of the RUSS, THE VILLAGER and CRAZY HORSE Divisions.* | 45 | 16 |

**Comments on Anticipated Future Performance**

| Date | Source | Alleged Misrepresentations | SAC ¶ | Ex. to Frankel Aff. |
|---|---|---|---|---|
| 9/21/92 | Women's Wear Daily | [Chazen] said the acquisition [of Russ Togs] will have no effect on Claiborne's earnings in 1992 but *[Russ Togs] might make a small contribution in 1993.* | 28 | 6 |

| | | | | | |
|---|---|---|---|---|---|
| | 12/2/92 | Mabon Securities Conference | Liz Claiborne Chairman Chazen explained that the company's greater-than-anticipated investment in the Russ Togs assets is likely to have an effect not only on the company's 1992 fourth quarter, but on its 1993 first quarter as well. <br><br> In an interview following the Liz Claiborne presentation today at the Mabon conference, company Chief Financial Officer Sam Miller declined to quantify just what impact [the investment in Russ Togs] is likely to have on the 1993 first quarter. He did say, however, the quarter is likely to be 'difficult.' <br> .... <br> To date, shipments of Russ Togs products have been 'nominal' and not likely to offset the money Liz Claiborne has been in investing in Russ, Chazen said. However, the executive said *he does expect the Russ shipments to "kick in," possibly as early as the 1993 second quarter, but "certainly" during the second half of [1993].* <br> ... <br> *Liz Claiborne isn't expected to feel the full benefits of a pick-up in the retail environment until the second quarter of [1993]....* | 35 | 9 |
| 9 | 2/16/93 | Press Release | Miller commented, "The 1992 year presented some difficult challenges for our Company, as we confronted conservative buying by our retail customers and dealt with start-up investments in our new Divisions: Russ, The Villager and Crazy Horse. Due to these factors and lower than anticipated bookings and margin erosion within certain divisions, as well as the timing of certain shipments to customers, we currently believe that our 1993 first quarter are likely to be in the range of 30% lower than those for our 1992 first quarter. *We also currently expect these circumstances to negatively impact earnings through the second quarter although to a lesser extent. Recent more favorable business trends and improving results in several of our divisions are expected to enable us to resume our growth during the second half of the year.*" | 38 | 10 |
| 10 | 2/17/93 | Women's Wear Daily | Quoting 5 <br> *Miller stated that he expects profits to show an increase for all of 1993.* | 39 | 12 |
| | 3/93 | 1992 Annual Report | As previously announced, in view of continued conservative buying by the Company's retail customers, and start-up investments in the Russ Divisions, lower than anticipated bookings and | 42 | 13 |

| | | | | | |
|---|---|---|---|---|---|
| | | | gross margin erosion within certain divisions, as well as the timing of certain shipments to customers, the company believes that 1993 first quarter are likely to be in the range of 30% lower than those for the record 1992 first quarter. The Company also currently expects these circumstances to negatively impact earnings through the second quarter, although to a lesser extent. *Due to recent more favorable business trends and improving results in several divisions, the company currently expects to resume our growth during the second half of the year.* | | |
| 12 | 4/19/93 | Press Release | Miller commented, "As expected, during the first quarter of 1993 we continued to face conservative buying by our retail customers, stat-up investments in our new divisions and, within certain other divisions, lower than anticipated bookings and margin erosion. *These circumstances will continue to negatively impact earnings through the second quarter, although to a lesser extent.* First quarter results were also negatively affected by the timing of certain shipments to customers. *More favorable business trends and improving results in several of our divisions are expected to enable us to resume our growth during the second half of the year.*" | 44 | 14 |
| 13 | 5/13/93 | Form 10–Q for period ending March 27, 1993 | As previously announced, during the first quarter of 1993 the Company continued to face conservative buying by retail customers, start-up investments in new divisions and, within certain other divisions, lower than anticipated bookings and margin erosion. These circumstances will continue to negatively impact earnings through the second quarter, although to a lesser extent. *The company expects to show increases in sales and earnings per share during the second half of the year.* | 45 | 16 |
| | 6/14/93 | Dow Jones Newswire | *Miller stated that earnings in the second quarter aren't expected to be down to the same extent that they were in the first quarter.* . . . . Miller says the retail business continues to be "fairly tough," with certain geographic areas hit harder than others. Southern California has been "very difficult," he says, adding that business in the Northeast hasn't been "all that strong." *Liz Claiborne still expects to be ahead with regard to earnings in the third and fourth quarters of this year, the executive says.* | 47 | 17 |

As noted above, to sustain a securities fraud claim, the alleged false or misleading statement must relate to a material fact. A fact is "material" if there is a substantial likelihood that a reasonable investor would view it as having significantly altered the "total mix" of information available. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). As materiality is a mixed question of fact and law, a complaint should not be dismissed for failure to establish a false or misleading statement's materiality "unless [the statement is] so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985).

As a general matter, the Court finds that certain of the alleged false statements in both categories (statements of present fact and comments on anticipated future performance) are simply too vague or too equivocal, especially when read in context, to be actionable. Statements (3), (7), and (8) fall into this category. Turning specifically to the remaining alleged statements of present fact (statements (1) through (2) and (4) through (6) above), the Court accepts that these comments, if false, are the type of representations that could support plaintiffs' 10b–5 claim. Nevertheless, these statements ultimately cannot sustain this claim because the SAC lacks particularized allegations demonstrating that the statements in question were false when made.

Rule 9(b) of the Federal Rules of Civil Procedure sets forth the pleading requirements for claims of fraud. Under Rule 9(b), "the circumstances constituting fraud . . . [must] be stated with particularity." Fed.R.Civ.P. 9(b). To comport with Rule 9(b), a plaintiff must not only give the who, what, and when with regard to an alleged false or misleading statement, but also must "give particulars as to the respect in which plaintiff contends the statements were fraudulent." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The purpose of these enhanced pleading requirements is to give a defendant fair notice of the claim against him, to protect a defendant's reputation from improvident charges of misconduct, and to limit strike suits. *See Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990). The Second Circuit has instructed that "these salutory purposes" are to be "rigorously enforce[d]." *Id.*

Recent Second Circuit case law evidences the Court of Appeals' exacting application of Rule 9(b) in the context of securities fraud claims. The Second Circuit has emphasized that Rule 9(b)'s particularity requirement demands specific factual allegations demonstrating that a statement was false or misleading when made. *See San Leandro*, 75 F.3d at 812–13; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994) (refusing to draw inference of fraud when plaintiff had failed to allege that defendant's disclosures expressing confidence in loan loss reserves were inconsistent with "most current reserve reports"). The Court's decision in *San Leandro*, in particular, establishes that to withstand a motion to dismiss, a plaintiff must detail specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question. *See San Leandro*, 75 F.3d at 812–13. The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made. *See id.* at 812 (holding that plaintiffs had not sufficiently demonstrated falsity of representation that sales were strong by relying on disclosure that occurred three weeks after representation was made); *Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir.1993) ("[T]emporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent."). Even more significant in the context of

this case, an "unsupported general claim of the existence of confidential company ... reports [containing adverse information] ... is insufficient to survive a motion to dismiss." *Id.* at 812. A plaintiff relying on such reports instead must indicate who prepared the reports, when the reports were prepared, what the reports said, how firm the data was, and who at the company reviewed the reports and when. *See In re NationsMart Corp. Secs. Litig.*, 130 F.3d 309, 320 (8th Cir.1997) (finding that plaintiffs' allegation that forward-looking statements lacked reasonable basis lacked requisite particularity because it did not state "who prepared the relevant figures and projections, when they were prepared, and who reviewed and evaluated the figures"), *cert. denied*, 524 U.S. 927, 118 S.Ct. 2321, 141 L.Ed.2d 696 (1998); *Arazie*, 2 F.3d at 1467 (affirming dismissal of securities fraud complaint pursuant to Rule 9(b) because plaintiffs failed to provide the "who, what, where and when" regarding internal memos and reports that allegedly demonstrated falsity of statements at issue), *cited with approval in San Leandro*, 75 F.3d at 812–13.

Broadly stated, plaintiffs allege that each of the statements of present fact was false or misleading because it failed to reveal the impact and import of declining orders from retailers, decreasing consumer demand for Claiborne apparel, disappointing sales, and poor retail "sell-through" rates. The factual allegations with regard to statement (2) are illustrative of plaintiffs' general approach. As statement (2) details, in the company's Form 10–Q for the third quarter of 1992 which was filed with the SEC on November 9, 1992, defendants represented (a) that Claiborne was planning its inventory on a conservative basis, (b) that the increase in inventory levels primarily reflected outlet store expansion, incremental inventories in shoes, and the addition of the Russ Togs Division, and (c) that the present inventory levels were appropriate to support currently anticipated sales levels. Plaintiffs assert that these representations were false or misleading because consumer demand for Liz Claiborne sportswear had fallen off and increasing inventory was and would be attributable to resulting decreased orders from retailers. (*See* SAC ¶ 33(a), (c), (d).) According to plaintiffs, orders for Claiborne's Holiday and Pre–Spring lines, which were placed between July and September 1992, were far below the prior year's levels. (*See id.* ¶ 33(b).) Orders for the Spring I and Spring II lines, which were placed between September and November 1992, were far below plan and far below the company's commitments to suppliers. (*See id.* ¶ 33(e).) Moreover, sales of activewear, menswear, and women's dresses allegedly were falling far short of plan. (*See id.* ¶ 33(e).) Plaintiffs further assert that defendants' representations were false and misleading because Claiborne had abandoned its historical practice of manufacturing less merchandise than there was a demand for and, as a result, was manufacturing more product than it could expect to sell at a profit. (*See id.* ¶ 33(d).)

Having closely examined plaintiffs' allegations, the Court concludes that with regard to all three representations within statement (2), plaintiffs fail to provide a particularized factual basis to support a conclusion that the alleged adverse circumstances existed and were known to the company at the time defendants made the statements in question. Plaintiffs do not identify the source of their allegations concerning orders, sales, and consumer demand, nor do they indicated how or when these alleged downward trends became known to the company. In this regard, the Court notes that the allegations in the SAC are readily distinguishable from those presented in *In re Ames Department Stores Inc. Stock Litigation*, 991 F.2d 953 (2d Cir.1993), one of the primary cases upon which plaintiffs rely. In *In re Ames*, plaintiffs identified specific internal forecasts and projections and particular complaints by the company's auditors that were inconsistent with defendants' public representations. *See id.* at 958–61. The

SAC fails to approach the specificity of the pleading at issue in that case.

In actuality, the only allegations that evidence the existence of known adverse information contemporaneous with the purported false statements are plaintiffs' general assertions that Claiborne generated monthly and weekly internal reports on the company's performance and held weekly meetings with retail buyers. These vague allegations are indistinguishable from those found to be insufficient in *San Leandro*. As was the case in *San Leandro*, plaintiffs do not identify specific reports or meetings, name the actors involved, or indicate the substance of the data or conversations. Their conclusory allegations on this point simply cannot withstand the close scrutiny Rule 9(b) requires.

■ The Court further notes that plaintiffs make these allegations on information and belief. Although a plaintiff may plead a fraud claim on information and belief when the facts underlying that claim are "peculiarly within the opposing party's knowledge," *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987), any such averment must "identify with particularity the facts upon which the belief is founded," *Stern v. General Elec. Co.*, 924 F.2d 472, 477 (2d Cir.1991). On this point, plaintiffs state only that they base the SAC on information adduced from Claiborne's filings with the SEC, documents disseminated to Claiborne's shareholders, press releases, news reports, reports of securities analysts, and "other publicly available relevant information." Information concerning the existence of non-public meetings with retailers and reports that purportedly contradicted the company's public representations, however, obviously could not have been culled from these sources.[4] *See also In re Health Management Sys., Inc. Secs. Litig.*, No. 97 Civ. 1865(HB), 1998

WL 283286, at *3 (S.D.N.Y. June 1, 1998) (finding nearly identical basis for information and belief allegations to be insufficient because it did not "indicate what publicly available articles, releases and filings the plaintiffs relied on ... [and] what 'other matters' of public record plaintiffs reviewed"). Plaintiffs therefore fail to provide the necessary factual basis for their allegations on information and belief concerning the occurrence of certain meetings and the existence of internal reports.

To summarize, the alleged adverse facts regarding statement (2) lack the particularity required to establish that that statement was false when made. As the allegations concerning the other purported false statements of present fact do not provide any more detail than those relating to statement (2), the Court concludes that the false statements of present fact, as pleaded, do not constitute actionable false or misleading statements under the securities laws.

■ Turning to the alleged statements on anticipated future performance (statements (7) through (14)), the Court finds that all of these representations fall under the rubric of "soft" optimistic projections that the Second Circuit has found cannot give rise to a securities fraud claim. These projections "lack the sort of definite positive projections that might require later correction," *see In re Time Warner*, 9 F.3d at 267, and therefore constitute non-actionable puffery, *see San Leandro*, 75 F.3d at 811; *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (" 'Soft,' 'puffing' statements ... generally lack materiality because the market price of a share is not inflated by vague statements predicting growth."). Moreover, all of these statements immediately followed candid disclosures of negative results for the preceding time period. As the Second Circuit has recognized, "[p]eople in charge

---

4. Indeed, plaintiffs' counsel acknowledged at oral argument that the only public statement reflecting the decreased orders was the company's July 16, 1993 revelation of weak business patterns and the resulting likelihood of significantly decreased earnings in fiscal 1993 that ultimately triggered this lawsuit. (Tr. May 17, 1996 Oral Arg. at 32.)

of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what the current data indicates, they can be expected to be confident about their stewardship and the prospects of the business they manage." *Shields*, 25 F.3d at 1129–30.

The Court notes plaintiffs' argument that defendants' projections cannot be dismissed as mere "puffing" in light of the alleged facts showing that those projections could not be squared with Claiborne's existing state of affairs. The Second Circuit has indicated that projections may fall within the scope of the securities laws if the defendant did not actually hold the favorable opinion expressed or if the projection lacked "a basis in fact." *In re Time Warner*, 9 F.3d at 266; *see also Goldman*, 754 F.2d at 1068 (recognizing that predictions can be actionable). To bring their claims within this line of authority, however, plaintiffs must provide particularized allegations demonstrating that no factual basis for defendants' optimistic predictions existed when those predictions were made. Plaintiffs have not done this.

Plaintiffs' allegations concerning statements (9) and (10) highlight the shortcomings of the present pleading in this regard. In those statements, which were made in mid-February 1993, defendants indicated that negative circumstances would impact earnings in the second quarter of 1993 less than the first quarter and that Claiborne expected positive results for the second half of 1993 and for the year on the whole. Plaintiffs present a series of factual allegations that they contend demonstrate the falsity of these optimistic representations. Plaintiffs note first that the company's earnings for 1993 ultimately were 42% lower than 1992 earnings. (*See* SAC ¶ 40(a).) According to plaintiffs, retail sales and "sell-throughs" in the first part of 1993 were disappointing, creating pressure on Claiborne to redesign, mark down, and reprice merchandise. (*See id.* ¶ 40(b)–(d), (g).) The company purportedly had to face criticism of its designs and changing

buying patterns by customers. (*See id.* ¶ 40(e), (h)–(i).) Claiborne also had to grapple with the failure of its "store within a store" concept and retailers changing demands with regard to their own inventories. (*See id.* ¶ 40(j)–(l).) Finally, orders for the Summer 1993 lines, which were placed in January and February 1993, were substantially below the anticipated levels. (*See id.* ¶ 40(f).)

As was the case with plaintiffs' allegations concerning the misrepresentations of present fact, these purported adverse facts fail to demonstrate that at the time defendants made their optimistic predictions, they had specific contemporaneous data showing that those positive views lacked any basis in fact. Most of the developments listed above are not placed in time, nor do plaintiffs attempt to identify exactly when defendants knew of these adverse circumstances. Rather, plaintiffs once again fall back on generalized claims regarding the existence of weekly sales reports. These allegations fail to comport with the particularity requirements of Rule 9(b) as those requirements have been applied by the Second Circuit. None of the other forward-looking statements are supported by a more substantial factual base. The Court therefore concludes that the comments on anticipated future performance also fail to support a securities fraud claim. The absence of an adequately pleaded false or misleading statement of material fact requires dismissal of the SAC.

*(2) Scienter*

Defendants also assert that the SAC fails to adequately plead the element of scienter. Rule 9(b) expressly states that its particularity requirement does not extend to scienter, which "may be averred generally." Fed.R.Civ.P. 9(b). In construing this provision of Rule 9(b), however, the Second Circuit has required that to sustain a securities fraud claim, a plaintiff must allege facts that give rise to a "strong inference" of scienter. *Acito v.*

*IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995). Allegations may generate a "strong inference" of fraudulent intent either (1) by showing that the defendant had a motive and a clear opportunity to commit fraud or (2) by identifying circumstances showing conscious or reckless behavior by the defendant. *See San Leandro,* 75 F.3d at 813; *see also Acito,* 47 F.3d at 53. When a plaintiff seeks to establish scienter by demonstrating conscious or reckless behavior, however, "the strength of the circumstantial allegations must be correspondingly greater." *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (en banc).

Defendants contend that the SAC lacks allegations that establish either motive and opportunity or conscious or reckless behavior. The Court will consider these arguments, in turn.

### (a) Motive & Opportunity

It is undisputed that the defendants in this case had a clear opportunity for committing fraud. They comprised the senior management of Claiborne during the class period and had ample opportunity to manipulate the stock market's valuation of the company's stock. What is at issue, therefore, is whether plaintiff's complaint adequately alleges that defendants had the requisite motive for committing fraud. "Motive ... entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields,* 25 F.3d at 1130. To make this showing, plaintiffs rely on the sales of Claiborne stock by the individual defendants during the class period. These defendants, in contrast, argue that their sales of company stock during the class period are insufficient to support a fraud claim. Defendants also argue that Liz Claiborne's sale of put warrants during the class period undermines any inference of fraudulent intent that may be imputed to them.

### (i) *Put Warrants*

■ Defendants' first argument as to why plaintiffs have failed to properly plead scienter is that the Company's sale of put warrants in April 1993 dramatically undermines any possible inference that defendants acted culpably. In short, defendants argue that the sale of the put warrants would have been irrational if defendants really knew that Claiborne stock prices would definitely plummet and that, therefore, this sale proves that the defendants did not know the stock price would fall.

On August 9, 1993, defendants filed a 10–Q for the period ending June 26, 1993 with the SEC. In this report, defendants explained that

> [i]n April 1993, in connection with its previously announced stock repurchase program, the Company sold put warrants in privately negotiated transactions based on the then-current market price of the Common Stock. The warrants obligate the Company to purchase 500,000 shares of its Common Stock in October 1993 on the respective expiration dates in October 1993. The proceeds of approximately $1.2 million from the sale of the put warrants have been recorded in capital in excess of par value. The Company's potential $17.7 million obligation to buy back 500,000 shares of Common Stock has been charged to capital in excess of par value and recorded as Put Warrants.

(Form 10–Q for Second Quarter Fiscal 1993 ¶ 6, Ex. 53 to Frankel Aff.).

A put warrant is a contract pursuant to which the seller of the warrant agrees to purchase, at the buyer's option, a specified number of shares at a certain time and at a specified price. The price specified in the contract is often referred to as the "strike price." When the market price of a share is above the strike price on the date the put can be exercised, the purchaser of the put will not normally exercise it, and the seller of the put will make money on the transaction. If, on the other hand, the market price is below the strike price,

the purchaser of the put will exercise the put and the seller of the put will lose money.

Defendants argue that they would not have issued these put warrants if they knew that third quarter earnings would be down, and that as a result the stock price would decrease. They contend that "[i]t is impossible to reconcile the sale of these put warrants with the knowing promulgation of misleading projections." (*See* Defs.' Mem. at 32.)

Plaintiffs respond that defendants' arguments regarding the sale of put warrants are unavailing for four reasons. First, plaintiffs contend that defendants' argument should be ignored because the complaint makes no reference to put warrants or to the Claiborne's Form 10–Q for the second quarter of fiscal 1993. Next, plaintiffs point out that the Form 10–Q only vaguely describes the put warrants and their purchasers. Thus, plaintiffs contend, neither they nor this Court have any way of knowing what these put warrants signify without discovery.

Third, plaintiffs contend that defendants' put warrant argument raises a question of fact because a jury could conclude, for instance, that defendants intended and believed they would not have to disclose the truth of Claiborne's poor performance before October 1993. If the defendants believed at the time these put warrants were sold that the "truth" of the company's situation would not be discovered until after the exercise date of the warrants, plaintiffs contend, then the sale of these warrants would not have been the potential liability that defendants claim they were. Finally, plaintiffs argue that the put warrants themselves provided defendants with a motive to continue their alleged fraud.

Having considered plaintiffs' arguments on this issue, the Court agrees that the defendants' contentions regarding the put warrants are not dispositive on the question of scienter. Although a factual hearing on this issue ultimately might support defendants' position that the sale of these put warrants creates an unmistakable inference of innocence, this Court is unpersuaded that it must draw such an inference at this point in the litigation. As noted previously, the Court must draw all reasonable inferences in plaintiffs' favor. Consequently, the Court concludes that the sale of the put warrants upon which defendants rely does not provide this Court with a basis to conclude that plaintiffs have failed to properly plead scienter.

(ii) *Stock Sales*

Defendants next assert that plaintiffs have failed to properly allege scienter because the facts set forth in the SAC, when considered in the context of the full stock transactions that occurred within the class period, do not show that defendants had the requisite scienter to sustain a securities fraud action.[5] According to the SAC and the SEC disclosure documents upon which it is based, the defendants engaged in a number of stock transactions during the class period. The transactions are properly divided into two categories.

Sales of Claiborne stock by defendants Chazen and Boxer comprise the first category of stock transactions. These defendants, both founders of the company, sold a total of 260,000 shares of stock during the class period. These sales were from the substantial stock holdings of these defendants held prior to the class period and were part of a pattern of stock sales that pre-dated the class period by over one year.

---

**5.** In its decision dismissing the amended complaint in this action, the Court found that the sales of stock by Claiborne insiders during the Class period established their motive to commit fraud. (*See* August 25, 1995 Memorandum and Order at 12.) In the present motion to dismiss, however, defendants have further clarified their position on this issue and provided additional substantiation for their arguments. Accordingly, the Court finds it appropriate to revisit this question at this juncture.

Sales of Claiborne stock by the remainder of the individual defendants comprise the second category of stock transactions taking place during the class period. These transactions involved the exercise of options to purchase shares of Claiborne stock at below market prices followed by the almost immediate sale of most of the just purchased shares. The table below depicts the sales and purchase patterns of these defendants:

| Defendant | A<br>Holdings<br>Entering<br>Period | B<br>Shares<br>Purchased | C<br>Cost of<br>Purchases | D<br>Shares Sold | E<br>Proceeds<br>from Sales | F<br>(E−C)<br>Net Cash<br>Proceeds | G<br>(A+B−D)<br>Holdings<br>at end of<br>period | H<br>(G−A)<br>Change in<br>Holdings |
|---|---|---|---|---|---|---|---|---|
| Mr. Falk | 30,000 | 50,000 | $774,000 | 40,000 | $1,701,687 | $927,687 | 40,000 | +10,000 |
| Mr. Miller | 1,000 | 9,963 | $175,549 | 9,463 | $393,755 | $218.206 | 1,500 | +50 |
| Mr. Listankowsky | 0 | 11,425 | $230,387 | 11,425 | $488,813 | $258,426 | 0 | 0 |
| Mr. Margolis | 25 | 30,450 | $513,056 | 20,250 | $858,189 | $345,133 | 10,255 | +10,200 |
| Mr. McNeary | 50 | 6,487 | $184,551 | 6,062 | $259,189 | $124,638 | 475 | +425 |
| Ms. McLemore | 6,475 | 7,531 | $141,563 | 5,000 | $213,750 | $72,187 | 9,006 | +2,531 |

*See* Frankel Aff.Exs. 46–51; SAC ¶¶ 7, 55.

Defendants argue that the pattern of sales and purchases depicted above can only be interpreted as innocent trading and cannot, as a matter of law, support the scienter element of a securities fraud claim. Plaintiffs respond that the volume of stock sales and the size of the defendants' profits from these sales creates the inference of fraudulent motive necessary to survive a motion to dismiss.

 "The mere fact that insider stock sales occurred does not suffice to establish scienter." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1224 (1st Cir.1996). To create an inference of scienter through the stock sales of insiders, plaintiffs must establish that the stock sales during the class period were "suspicious" or "unusual." *See Acito*, 47 F.3d at 54 (holding that scienter was insufficiently pleaded because stock sale by single insider was not "unusual"); *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir.1994) ("Insider trading in suspicious amounts or at suspicious times is ... presumptively probative of bad faith and scienter."); *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter"). In evaluating whether a stock transaction is so "unusual" as to support an inference of motive, the court assumes that "the defendant is acting in his or her informed economic self-interest." *Shields*, 25 F.3d at 1130.

The central question, then, is whether the stock transactions in question were so "suspicious" or "unusual" as to give rise to the strong inference of fraudulent intent. The stock transactions in which the defendants Boxer and Chazen engaged do not pose serious analytical difficulty. Both defendants made substantial sales in the quarters preceding the class period. The sales in which they engaged during the class period adhered to the pattern of these prior sales and do not appear to be "unusual" in either their amount or their timing. The Court concludes, therefore, that plaintiffs have failed to plead scienter adequately as to these defendants.

In contrast to the sales by Chazen and Boxer, the stock sales of the other defendants present a superficially more difficult issue. As described above, the bulk of these defendants exercised stock options to purchase shares of Claiborne stock at below-market prices and then almost immediately sold most of their just purchased stock at considerable profits. Defendants contend that these transactions were not unusual for two reasons.

First, defendants argue that the defendants had strong tax incentives to exercise their stock options and then almost immediately sell their shares. In late 1992, the defendants contend, corporate America was on notice that the Clinton Administration intended to seek an increase in the

marginal tax rate of wealthy Americans. Defendants argue that thousands of executives, frightened by the implication this tax increase would have on their personal taxes, rushed *en masse* to exercise their stock options.[6] Defendants assert that they were merely part of this move to avoid the Clinton tax-increase.

Defendants also argue that the exercise of the stock options was necessarily followed by sales of the purchased shares because a purchaser of shares with stock options is immediately liable for taxes on the difference between the strike price and the market price at the close of the day immediately preceding the exercise of the option. Because this tax rule subjected defendants to significant and immediate tax liabilities, they argue that they were forced to sell their shares almost immediately after exercising their options to pay the taxes they incurred when they exercised their options.

Finally, defendants argue that the fact that most of the defendants actually increased their Liz Claiborne holdings undermines any inference of fraudulent intent that the stock sales might create. Why, defendants ask, would they increase their holdings in Liz Claiborne stock if they believed that the Company's stock would soon fall? Such behavior, they argue, would have been contrary to their economic best interest. The fact that most defendants increased their holdings, defendants argue, destroys any possible inference that they had a motive to commit fraud.

Plaintiffs respond that the fact that defendants did not sell all of the shares they bought when they exercised their options is immaterial. "At this stage in the litigation, one can only speculate as to defendants' motives in not selling all of their shares." (Pl.Mem.Opp. at 54.) Plaintiffs also contend that all of the options could

have been rendered worthless had the stock price fallen before they were exercised. Indeed, the options exercised by defendants had strike prices ranging from $15.50 to $29.25. Claiborne stock has sold for as low as $18 per share since the end of the class period. If the price had fallen this low before the end of 1992, as plaintiffs contend it would have absent defendants' alleged misrepresentations, then many of defendants' stock options would have been worthless.

In analyzing this issue, the Court finds it helpful to focus on two factors often considered by courts in determining whether insider stock transactions are so "unusual" as to give rise to an inference of scienter— the amount of securities involved and the timing of the transactions.

*Amount of Sales*

The amount of securities bought and sold during the class period is not disputed by the parties. Indeed, plaintiffs have incorporated the Form 4s upon which the defendants rely in their complaint. According to these disclosure documents the defendants who exercised stock options sold 92,200 shares of Liz Claiborne stock during the class period. These sales generated gross proceeds of $3,915,383; and net proceeds of $1,946,277.[7]

At first blush, these transactions seem to support plaintiffs' assertion that the amount of securities involved create a strong inference of fraudulent motive. Indeed, there were a large number of securities sold by the defendants and these sales generated large proceeds and profits. However, large proceeds alone are not suspicious per se, *see In re Buffets, Inc. Secs. Litig.,* 906 F.Supp. 1293, 1300 (D.Minn. 1995) (observing that "large proceeds might be suspicious if other facts were present"), and other relevant facts may

---

**6.** Stock options are taxed on the day they are exercised at the option-holders marginal tax rate. 26 C.F.R. § 1.83–7(a). The amount of tax liability is the difference between the exercise price and the market price on the day

before the option is exercised multiplied by the marginal rate of the tax payer.

**7.** These defendants expended $1,969,106 to purchase shares through the exercise of stock options.

undermine any inference of fraud arising from them.[8] In this case, the Court finds it significant that by the end of the class period, these defendants held 23,306 more shares than they did prior to the beginning of the class period. Inferences of scienter can be undermined when an insiders' sales of stock are offset by even larger stock acquisitions during the relevant time period. *See Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir.1995). In the Court's view, the evidence concerning the amount of stock at issue is inconclusive and does not support fraudulent intent.

*Timing of Sales*

█ The timing of a transaction is unusual or suspicious when its timing is "calculated to maximize personal benefit from inside information." *In re Apple Computer*, 886 F.2d at 1117 (*citing Lilly v. State Teachers Retirement Sys.*, 608 F.2d 55, 56 (2d Cir.1979); *SEC v. Musella*, 578 F.Supp. 425, 441 (S.D.N.Y.1984); *Jefferies & Co. v. Arkus–Duntov*, 357 F.Supp. 1206 (S.D.N.Y.1973)). Under this standard, the timing of the defendants' stock transactions cannot be considered unusual.

As an initial matter, the timing of the sales did not closely coincide with any of the alleged false comments, such that the Court could infer that the defendant in question sought to reap the immediate benefit a falsely positive statement had on the market. The majority of the stock option sales took place in mid- to late-December 1992. Although defendants made some of the comments included in the SAC in early December, most of the sales took place well over two weeks after these comments were made. Furthermore, the sales at issue pre- and post-date most of the comments of which plaintiffs complain by months. These sales would have to be much closer in time to the alleged misstatements to give rise to a suspicion of fraud. The Court further notes that the stock sales at issue took place, for the most part, over six months prior to the release of the negative disclosure by Claiborne on July 16, 1993. Such timing does not suggest that the defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price.

In sum, the timing of the sales of stock purchased through stock options does not support a strong inference of fraudulent intent. Indeed, given that these sales did not closely follow the alleged misstatements and were not temporally related to the bad news, the flurry of transactional activity by these defendants within a limited time period suggests not that there was fraud, but that the sales were precipitated by some other factor such as an impending tax increase. In any event, the Court concludes that the stock sales at issue, being remote in time from any misstatements and in amounts that do not necessarily support a claim of fraud, were not unusual or suspicious and therefore do not demonstrate that defendants had a motive to commit fraud. Consequently, the plaintiffs have not properly pleaded scienter by establishing defendants' motive and opportunity to commit fraud.

(b) Conscious or Reckless Behavior

█ Defendants also challenge the sufficiency of the SAC by asserting that plaintiffs have failed to identify circumstances indicating conscious or reckless behavior by the defendants. Plaintiffs respond that the allegations in their complaint give rise to a strong inference of recklessness and are, therefore, sufficient to plead scienter. Plaintiffs do not press a claim that they have properly identified circumstances indicating conscious behavior by the defendants.

As detailed at length above, plaintiffs allege that defendants made a series of statements that were wholly inconsistent

---

8. One factor that would be relevant to this analysis would be the pattern of these insiders' prior sales of Liz Claiborne stock. Neither party has provided this information and the Court, therefore, cannot consider this factor in determining whether the stock sales at issue here were usual or unusual.

with Claiborne's current state of affairs. Plaintiffs further assert that defendants knew or recklessly disregarded each alleged fact that demonstrated the falsity or misleading nature of the representations made to the public. Evidence of this knowledge or reckless disregard, plaintiffs submit, can be found in the existence of internal corporate documents, conversations with company insiders, monthly performance reports, data from retail stores, and, most significantly, weekly meetings with major buyers through which defendants allegedly became aware of the decreasing demand for Claiborne apparel and the company's operational difficulties.

For the same reasons that these allegations fail to demonstrate that the falsity of the statements at issue, they do not permit an inference of reckless or conscious behavior. *See Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 365 (1st Cir. 1994) (finding that allegations of scienter satisfied Rule 9(b) when plaintiffs "specifically identif[ied] the internal reports [revealing review problems and inadequate loan loss reserves] and the public statements underlying their claims, providing names and dates"), *cited with approval in San Leandro,* 75 F.3d at 812. Under the current pleading, any inference of conscious or reckless behavior would be one based upon speculation. Rule 9(b) does not permit the Court to draw such an inference.

### Conclusion

For the reasons set forth above, the Court concludes that the plaintiffs in this action have failed to properly plead a material false or misleading statement or the element of scienter. The Court, therefore, grants defendants' motion and dismisses the second amended complaint.

SO ORDERED.