Todd B. SANDMIRE, Plaintiff,

v.

ALLIANT ENERGY CORP., Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer, Defendants.

Kurt Leib, Plaintiff,

v.

Alliant Energy Corp., Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer, Defendants.

John A. Brugger, Plaintiff,

v.

Alliant Energy Corp., Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer, Defendants.

Mary Imoehl, Plaintiff,

v.

Alliant Energy Corp., Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer, Defendants.

Robert A. Dittmar, Plaintiff,

v.

Alliant Energy Corp., Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer, Defendants.

William Von Meyer, Plaintiff,

v.

Alliant Energy Corp., Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer, Defendants.

Richard Woods, Plaintiff,

v.

Alliant Energy Corp., Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer, Defendants.

Nos. 03–C–0191–S, 03–C–218–S, 03–C–242–S, 03–C–263–S, 03–C–264–S, 03–C–287–S, 03–C–320–S.

United States District Court,

W.D. Wisconsin.

Aug. 12, 2003.

Robert O'Reilly, Steven G. Schulman, Jonathan Stein, Marc A. Topaz, Susan Lacava, Robert I. Harwood, Richard Lockridge, Paul Geller, Mel E. Lifshitz, Robert M. Roseman, Carol V. Gilden, Guri Ademi, David Kessler, for Plaintiffs.

Gordon Davenport, Foley & Lardner, Madison, WI, for Defendants.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Lead plaintiffs William D. Ecker, James H. Sutton, Dudley L. Page and Thomas Pendergast, on behalf of Scot Holdings, Inc., pursue this securities fraud class ac-

tion against the defendant Alliant Energy Corp. and its officer defendants Erroll B. Davis, Jr., Thomas M. Walker and John E. Kratchmer alleging that plaintiffs relied on defendants' material misrepresentations and omissions when they acquired Alliant Energy stock during the period January 29, 2002 to July 18, 2002. The matter is presently before the Court on defendants' motion to dismiss the action for failure to state a claim. The following is a summary of the factual allegations of the amended consolidated class action complaint.

## FACTS

Defendant Alliant is a Wisconsin utility holding company which owns two public utilities, Wisconsin Power and Light (WP & L) and Interstate Power and Light, serving customers in Wisconsin, Iowa, Minnesota and Illinois. During the relevant period defendant Davis was Alliant's chief executive officer, president and chairman of its board of directors, defendant Walker was Alliant's chief financial officer and executive vice president and defendant Kratchmer was Alliant's controller and chief accounting officer. By virtue of these positions the individual defendants controlled and were responsible for the contents of Alliant's public reports and statements.

As owner of public utilities Alliant is regulated by the Public Service Commission of Wisconsin (PSCW) and the Iowa Utilities Board. In addition to its public utility holdings Alliant made investments in unregulated business ventures including ventures in Brazil, China, New Zealand, Australia and Mexico in an effort to generate earnings growth greater than typical of regulated utilities. PSCW regulations limited these unregulated investments to 25% of utility assets. PSCW regulations also precluded WP & L from paying dividends to its shareholder Alliant, if such dividends would reduce WP & L's average common

equity ratio below 52% of total capitalization.

One of Alliant's unregulated investments was a $41 million loan to a Mexican resort development made in 1999. The development, scheduled to be complete in 2001, included a 3.5 mile sea wall. In April 2000 a storm destroyed the portion of the sea wall that had been built and also damaged other portions of the resort infrastructure, causing the development to return money to time share condominium purchasers.

On January 29, 2002 Alliant issued a press release discussing its 2001 financial results which included the following statements:

"This past year presented many significant challenges—extraordinary droughts in both Brazil and New Zealand; a slowing domestic economy; and pressures on our utility profits given we were in the final year of our four-year price freezes—just to name a few," said Alliant Energy CEO Erroll B. Davis, Jr. "And while not all our businesses performed as we expected, we overcame these challenges and managed to deliver adjusted earnings within the earnings guidance we provided throughout the year. We said we would achieve 7–10 percent growth in adjusted earnings and we delivered. This is a testament to our people, our diversification and our strategy."

. . . . .

The Company's Brazil investments did not perform up to expectations, although there were several extenuating circumstances that contributed to the disappointing results. Primary drivers of the decreased earnings were lower sales related to a severe drought; impacts of a settlement reached in the fourth quarter between the Brazil government and the distribution companies related to the economic resolution of the impacts of

rationing, the recovery of past costs and the prices allowed for sales of excess generation into the spot market; commercial energy losses; higher uncollectible customer account balances due to revised regulatory requirements and increased interest expense. Brazil experienced a severe drought in 2001 and, as a result, the government implemented a significant electricity rationing program in June given that the large majority of generation in Brazil is hydroelectric.

. . . . .

Thomas M. Walker, Alliant Energy's Chief Financial Officer stated, "Given the potential downward pressures on earnings from recent decreases in oil and gas prices, the slowing economy and risks associated with the level of rate recovery we will realize in 2002, we have lowered our guidance for estimated adjusted earnings we share for 2002 by $0.05 per share to a range of $2.45—$2.65 per share. We expect to mitigate these downward pressures by the continued improved profitability of our non-regulated investments, including recovery of oil and gas prices later in 2002, a rigorous cost and capital control program and the continued successful execution of our strategic plan. In spite of the potential downward pressures on earnings, our goal remains delivering 7–10 percent annual adjusted earnings growth and enhanced shareowner value as well as meeting our financial objectives, including maintaining our stable divided and investment grade credit ratings."

On March 27, 2002, Alliant filed its fiscal year 2001 SEC Form 10–K which included the following statements:

The 2001 increase in adjusted earnings was primarily due to an increase from Alliant Energy's non-regulated businesses of $0.14 per share ($0.36 and $0.22 per share in 2001 and 2000, respec-

tively). Contributing to the increase were higher earnings from Alliant Energy's Investments business unit of $0.24 per share, led by record earnings from Alliant Energy's oil and gas business, and the impact of lower short-term interest rates. These items were partially offset by lower earnings from Alliant Energy's non-regulated Generation and Trading ($0.10 per share), International ($0.08 per share) and Integrated Services ($0.04 per share) business units. Earnings from utility operations decreased $0.07 per share ($2.05 and $2.12 per share in 2001 and 2000, respectively) due to increased operating expenses and lower gas margins, partially offset by a lower effective income tax rate, higher electric margins, a reduction of net interest expense and increased steam margins. Income of $0.13 per share ($0.08 and $0.05 per share at the parent Company and IP & L, respectively) from the resolution of a significant tax case Alliant Energy had pursued for years also contributed to the 2001 increase in adjusted earnings.

. . . . .

At December 31, 2001 and 2000, Resources had a loan receivable (including accrued interest income) from a Mexican development company of $41 million and $18 million, respectively. Under provisions of the loan, Resources has agreed to lend up to $65 million to support the development of a resort community near the Baja peninsula in Mexico. The loan accrues interest at 8.75% and is secured by the undeveloped land of the resort community. Repayment of the loan principal and interest will be based on a portion of the proceeds received from the sales of real estate in the resort community and therefore is dependent on the successful development of the project and the ability to sell real estate.

Alliant Energy may also realize royalty income on the real estate sales once the loan is repaid.

.    .    .    .    .

Alliant Energy is the sole common shareowner of all 13,236,601 shares of WP & L common stock currently outstanding. During 2001, WP & L paid dividends on its common stock of $60 million to its parent (includes dividends from an equity method investment). WP & L did not declare common stock dividends during 2000 due to management of its capital structure. WP & L's common stock dividends are restricted to the extent that such dividend would reduce the common stock equity ratio to less than 25%. Also the PSCW ordered that it must approve the payment of dividends by WP & L to Alliant Energy that are in excess of the level forecasted in the rate order if such dividends would reduce WP & L's average common equity ratio below 52% of total capitalization. The dividends paid by WP & L to Alliant Energy since the rate order was issued have not exceeded such level.

On April 19, 2002 Alliant issued a press release addressing its 2002 first quarter financial results which included the following statements:

The decrease in adjusted earnings was primarily the result of lower oil and gas prices in the first quarter of 2002 compared to the same period in 2001; lower earnings from Alliant Energy's utility operations, largely due to higher operating expenses and lower electric and gas margins; and the effect of the one-time asset valuation charges. The impact of the lower utility revenues, due to extremely mild weather in the first quarter of 2002 and a continuing sluggish economy in the upper Midwest, prevented Alliant Energy from offsetting its higher utility operating expenses in the first quarter of 2002.

"We view these short-term earnings challenges as an aberration but believe they compromise our ability to achieve our previously stated 2002 earnings targets," said Alliant Energy CEO Erroll B. Davis, Jr. "However, with an economic recovery and favorable regulatory treatment, we remain confident in our plan to return Alliant Energy to delivering 7–10 percent annual adjusted earnings growth in 2003 and beyond," continued Davis.

Alliant's non-regulated businesses reported an adjusted net loss of $20.5 million in the first quarter of 2002 compared to adjusted net income of $3.8 million in the first quarter of 2001. Reported (GAAP) net loss for 2002 and 2001 was $15.1 million and $23.0 million, respectively.

49. The negative results of Alliant's non-regulated businesses were also attributed to external or short-term factors, such as lower oil prices and volume, a soured investment in a start-up that "will not impact Alliant Energy's second quarter financial results," and mild weather in Australia that impacted its investments in generation assets there. The Company's investments in Brazil were expected to deliver as soon, it said, as the energy rationing that had negatively impacted its business was lifted. For 2002, the Company lowered its earnings estimate:

Alliant Energy has revised its guidance for estimated adjusted earnings in 2002 to a range of $2.10—$2.30 per diluted share from its previous guidance of $2.45—$2.65. The guidance does include the asset valuation charges of $0.10 per share recorded in the first quarter of 2002 related to Alliant Energy's Enermetrix and Capstone investments.

On May 15, 2002 Alliant filed its first quarter 2002 SEC Form 10–Q which included the following statement:

Alliant Energy realized 15% and 10% of its adjusted earnings from its non-regulated businesses in 2001 and 2000, respectively, and its goal is to have such businesses contribute more than 25% of its adjusted earnings within the next three years. Alliant Energy believes that successful implementation of these strategies will contribute significantly to Alliant Energy achieving its targeted long-term annual growth rate of 7% to 10% in adjusted earnings.

The form 10–Q also identified as "drivers for Alliant Energy's earnings estimates":

— Improved results of its Brazil investments through factors discussed earlier as well as the continued growth in earnings from its China investments.

— Improved earnings from Whiting from current levels, including the recovery and stability of oil and gas prices and continued successful execution of its acquisition strategy.

— Continued improved profitability of its other non-regulated businesses as a whole, including the Integrated Services and Generation of Trading business units.

— No additional material permanent declines in the fair market value of, or expected cash flows from, Alliant Energy's investments.

On July 18, 2002 Alliant issued a press release stating in part:

Alliant Energy is lowering its 2002 adjusted earnings guidance to a range of $1.35—$1.55 per diluted share from its previous guidance of $2.10—$2.30. Certain significant factors have contributed to Alliant Energy providing updated 2002 adjusted earnings guidance. These factors include: changes in the anticipated timing and amount of utility rate relief that may be realized in 2002, a continued sluggish economy, the impact of lower than anticipated oil and gas prices and volumes, the elimination of previously anticipated earnings from Alliant Energy's electricity trading joint venture given the pending sale of such investment and the lower than anticipated second quarter results.

All of defendants' press releases and reports contain language similar to the following statement in the January 29, 2002 press release:

This press release includes forward-looking statements. These forward-looking statements can be identified as such because the statements include words such as "expects" or "estimates" or other words of similar import. Similarly, statements that describe future financial performance or plans or strategies are also forward-looking statements. Such statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those currently anticipated. Actual results could be affected by such factors as: the factors listed in the "Future Earnings Outlook" section of this press release; weather conditions; regulatory or governmental actions; economic and political conditions in Alliant Energy's domestic and international service territories; unanticipated issues related to Alliant Energy's ability to implement its strategic plan, especially as it relates to international investments; Alliant Energy's ability to identify and successfully complete acquisitions and development projects; material changes in the value of Alliant Energy's investments; technological developments; and inflation rates. These factors should be considered when evaluating the forward-looking statements and undue reliance should not be placed on such state-

ments. Without limitation, the expectations with respect to projected earnings in the "Future Earnings Outlook" section of this press release are forward-looking statements and are based in part on certain assumptions made by Alliant Energy, some of which are referred to in the forward-looking statements. Alliant Energy cannot provide any assurance that the assumptions referred to in the forward-looking statements or otherwise are accurate or will prove to be correct. Any assumptions that are inaccurate or do not prove to be correct could have a material adverse effect on Alliant Energy's ability to achieve the estimates or other targets included in the forward-looking statements. The forward-looking statements included herein are made as of the date hereof and Alliant Energy undertakes no obligation to update publicly such statements to reflect subsequent events or circumstances.

In November 2002 Alliant announced a shift in strategy which included divestiture of unregulated assets and a focus on utility operations.

## MEMORANDUM

Defendants move to dismiss the amended complaint on the basis that it does not sufficiently allege misstatements or omissions of fact, that many of the allegations fall within the safe harbor provisions of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–5 and that the allegations are insufficient to support an inference of scienter. Plaintiffs generally oppose the motion and particularly focus on the circumstances surrounding Alliant's Mexican resort investment.

A complaint should be dismissed for failure to state a claim only if it appears beyond a reasonable doubt that the plaintiffs can prove no set of facts in support of the claim which would entitle the plaintiffs to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In order to survive a challenge under Rule 12(b)(6) a complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984).

However, the pleading threshold for a federal securities fraud action has been heightened, even beyond the particularity requirement of Rule 9(b), by the provisions of the PSLRA. In an action based on a material misstatement of omission such as this, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, concerning allegations of scienter the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Additionally, the PSLRA precludes liability for "forward-looking statements" that are accompanied by appropriate cautionary statements or made without actual knowledge of falsity. 15 U.S.C. § 78u–5(c).

Considering these pleading standards it is apparent that the allegations of the amended consolidated complaint cannot withstand the motion to dismiss. A Rule 10b–5 securities fraud claim includes six elements: (1) a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries. *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276 (7th Cir.1996).

The great majority of the representations contained in the public statements and financial filings are historical financial data which are not alleged to be false and so cannot meet the first element. Even as to the explanations for the decline in profitability of specific ventures there is no allegation of falsity or misrepresentation. The remaining portions, upon which plaintiffs rest their opposition to the motion fall into three categories: (1) expressions of optimism that non-utility investments would return to profitability enabling Alliant to achieve its goals of 7–10% annual earnings growth and contributing 25% of profits and related earning per share projections; (2) the delay in reporting information concerning the reduced value of the Mexican resort loan; (3) the statement in the 2001 10–K report that dividends paid by WP & L to Alliant Energy had not exceeded the level permitted by the PSCW.

■ Plaintiffs assert that the first category of statements meet the pleading requirements because these predictions and projections lacked a reasonable basis, defendants knowing to the contrary that the non-utility investments were failing and projections and goals could not be met. The only factual allegation underlying the assertion that defendants knew their projections were false is that they knew about the devaluation of the Mexican resort loan receivable. As a matter of law these predictions, projections and goals considered in connection with the cautionary language accompanying them fall within the safe harbor provisions of the PSLRA and cannot be the basis for a viable securities fraud action. Pursuant to 15 U.S.C. § 78u–5(c):

> in any action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading [an issuer or its agent]

shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that -

> (A) the forward-looking statement is -
> (I) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement; or
> (ii) immaterial; or . . . .

"Forward-looking statement" is defined at 15 U.S.C. § 78u–5(i)(1) to include:

> (A) a statement containing a projection of revenues, income (including income loss) earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis by the management or in the results of operations included pursuant to the rules and regulations of the commission;
> . . . .

The statements in category (1) are classic "forward looking statements" clearly falling within the PSLRA definition and plaintiffs do not attempt to argue otherwise. Neither do plaintiffs make any real argument that the cautionary language contained in defendants statements fails to meet the requirements of 78u–5(c)(A)(i). Concerning the cautionary language plaintiffs note in cursory fashion that the sufficiency of cautionary language raises a fact question that cannot be resolved on a motion to dismiss. This position is legally

incorrect. In fact, the PSLRA directs the Court to consider the effect of the cautionary language on a motion to dismiss. 15 § 78u–5(e). The statute thereby expressly contemplates that the nature of the statements as forward-looking and the sufficiency of the cautionary language may be subject to resolution on a motion to dismiss. Here the cautionary language is detailed and identifies specific factors likely to influence actual results, thus apparently satisfying the statutory requirements. Plaintiffs cannot avoid dismissal merely by asserting that cautionary language always raises a question of fact, they must have some basis to suggest that it is inadequate. Accordingly, the statements fall within the safe harbor provision and cannot be the basis for a viable claim.

Plaintiffs contend that dismissal is inappropriate because at the time of the forward-looking statements defendants knew of the Mexican loan devaluation and therefore had knowledge that the projections were without a reasonable basis. Assuming the complaint sufficiently alleged this it would not avoid dismissal of the claims based on the forward looking statements. Proof of knowledge that a forward-looking statement was false relates to a separate and distinct safe harbor provision, § 78u–5(c)(1)(B). Such knowledge and the state of mind of the defendants at the time the statement was made are irrelevant to a safe harbor defense based on cautionary language. *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999). The omission of an underlying known fact does not render the statements not forward-looking. *Ehlert v. Singer*, 245 F.3d 1313, 1318 (11th Cir.2001).

█ The alleged omission of timely disclosure concerning the Mexican loan and the dividend limit representation are not forward-looking statements and not subject to the safe harbor. Whether they support a claim depends on whether all elements of a securities fraud claim are sufficiently alleged—whether the allegations support a finding that either was a misstatement or omission of a material fact made with scienter. Neither the allegations concerning the Mexican loan nor the allegations concerning the dividend payment are sufficient to support a claim.

Concerning the Mexican resort loan it is alleged that in 1999 Alliant made the loan to plan, develop and build a 3200 acre resort including 1681 homes and condominiums as well as other amenities. The loan was secured by the undeveloped land. Construction began in December 1999 and a storm damaged the construction in progress in April 2000. As a result of the storm the developers returned money to time share purchasers. No reduction was made to the value of the receivable on Alliant's books until July 2002 when Alliant recorded a $.05 per share charge against income based on a $6.9 million reduction in the value of the loan. Defendant Davis owns a vacation home in Scottsdale, Arizona.

It is possible to infer from the fact that the storm damage occurred in 2000 and the value of the loan was ultimately written down in 2002, that the loan value had declined before the write down was implemented, perhaps implicating a failure to comply fully with generally accepted accounting principles. It is also possible that a $.05 per share reduction in income is sufficient to be a material concern to investors. However, the allegations relating to the omission do not nearly meet the requirement that facts be stated with particularity which give rise to strong inference of scienter. Scienter means that a person acts with intent (or reckless disregard of the truth) to deceive or manipulate. *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir.1998).

Significant accounting irregularities which materially misstate revenue or financial condition can be indirect evidence of scienter, but minor or technical accounting errors generally are not. *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000). If the accounting treatment of the Mexican resort loan was a GAAP violation it was a relatively minor one involving real estate value judgment and estimations of future cash flows, not a fundamental and inherently deceptive disregard for accounting principles. Plaintiffs allege that accounting principles obligated defendants to reduce the value of the loan receivable if it became probable that Alliant would be unable to collect the full amount according to its terms and the amount of the impairment could reasonably be estimated. Estimation of impairment, if any, should take into account the present value of future cash flows and the value of collateral securing the loan. The fact of storm damage at a 3200 acre real estate project several months old does not by itself suggest that the financing loan secured on the undeveloped land is necessarily impaired. Furthermore, estimating the impact of such an event on the value of the land or the potential future cash flows is at best an imprecise undertaking. Accordingly, a delay in reaching an estimate is very weak evidence of an intent to misrepresent the financial status of the asset.

Allegations concerning the intent and knowledge of the individual defendants are insufficient to raise any inference of scienter, much less a strong one. There is no direct allegation that any individual defendant had actual knowledge of the value of the property or had seen it. The attempt to infer knowledge by defendant Davis from his Scottsdale vacation home two hundred miles away from the resort is amusing, particularly in the absence of any allegation that any individual defendant has ever visited the property. The $6.9

million loan value reduction, though perhaps significant in size from an absolute perspective, would have a relatively minor impact on the overall financial success of Alliant (which reports assets in excess of $6 billion) or even its unregulated investments ($1.85 billion) and would not suggest that corporate leaders would necessarily be aware of the situation and certainly does not supply a motive to intentionally delay this relatively minor asset reduction as a means to deceive investors.

The remaining general allegations that defendants had motivation to keep stock prices high and to make unregulated investments appear successful do little to bolster an inference of scienter. Motivations to keep stock prices high to increase personal salaries and to boost financial standing to gain regulatory approval are so common among corporations and their officers that allowing them to satisfy the scienter allegation requirement would be tantamount to eliminating it. *See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 814 (2nd Cir.1996). The allegations as a whole relating to scienter are insufficient to create even a weak inference thereof.

■ The analysis concerning scienter applies with at least equal force with respect to the alleged misrepresentation involving a dividend payment exceeding the PSCW regulatory threshold. In addition, it is clear such a misrepresentation was not material in the sense that it would have been viewed by the reasonable investor as significantly altering the total mix of information available. *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The amount involved is insignificant compared to the total assets of Alliant. Of even greater relevance, the transfer of cash from a wholly owned

subsidiary to the parent stock issuer would have virtually no impact on the value of the parent's stock or an investor's view of the value of the stock. An investor is unlikely to view such a minor regulatory violation as an important component of the in the mix of information about the stock.

## CONCLUSION

The vast majority of the allegations in the complaint are accurate recitations of historical fact or forward-looking statements that fall comfortably with the PSLRA's safe harbor provisions. The two alleged misrepresentations which might support a claim lack any allegations which could support a reasonable, much less strong, inference of scienter and are immaterial. Accordingly, the amended consolidated class action complaint fails to state a claim for securities fraud and must be dismissed.

## ORDER

IT IS ORDERED that defendants motion to dismiss the amended consolidated class action complaint is GRANTED.

IT IS FURTHER ORDERED that judgment be entered dismissing plaintiffs' complaint and all claims contained therein without prejudice.